## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANNING HUANG, derivatively on behalf of J2 GLOBAL, INC., | |
| Plaintiff, | C.A. No. |
| vs. | |
| VIVEK SHAH, NEHEMIA ZUCKER, R. SCOTT TURICCHI, DOUGLAS Y. BECH, ROBERT J. CRESCI, SARAH FAY, W. BRIAN KRETZMER, JONATHAN F. MILLER, RICHARD S. RESSLER, and STEPHEN ROSS, | DEMAND FOR JURY TRIAL |
| Defendants, | |
| and | |
| J2 GLOBAL, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Danning Huang ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant J2 Global, Inc. ("J2 Global" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Vivek Shah, Nehemia Zucker, R. Scott Turicchi, Douglas Y. Bech, Robert J. Cresci, Sarah Fay, W. Brian Kretzmer, Jonathan F. Miller, Richard S. Ressler, and Stephen Ross (collectively, the "Individual Defendants," and together with J2 Global, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of J2 Global, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of

1

the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding J2 Global, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by J2 Global's directors and officers from October 5, 2015 through the present (the "Relevant Period").

2.      J2 Global is a California-based provider of internet services, including cloud-based tools and support services. The Company also owns and operates a variety of digital media properties, including well-known web properties such as IGN, PC Mag, and Everyday Health Group ("Everyday Health").

3.      For much of its history, a key driver of J2 Global's growth has been its steady rate of new acquisitions. In recent years, however, the Company's stream of acquisitions has slowed, and as a result—coupled with declining digital traffic and increased cloud cancel rates—the Company's business has begun to suffer.

4.      Throughout the Relevant Period, in order to conceal underperformance on the part of the Company and its subsidiaries, the Individual Defendants caused the Company to engage in

improper accounting practices, including by declining to record goodwill impairments at the parent level even when clearly warranted by a given subsidiary's performance. Moreover, for years prior to the Relevant Period, and continuing throughout the Relevant Period, the Individual Defendants caused the Company to engage in and facilitate a number of undisclosed related party transactions that enabled Company insiders to unjustly enrich themselves to the detriment of the Company and its shareholders.

5.     Despite this, during the Relevant Period, the Individual Defendants repeatedly, misleadingly attested to the accuracy of the Company's accounting treatment of business combinations and goodwill impairments, among other things, and affirmatively represented to the investing public that J2 Global's SEC filings fully and accurately disclosed all related party transactions that the Company was involved in.

6.     Much of the above-described material facts were concealed from the investing public until March 10, 2016 when Citron Research published a report entitled "Citron Exposes the Dirty Secrets of j2 Global (JCOM)" (the "Citron Report").[1] The Citron Report exposed a number of potential problems with J2 Global's accounting practices by pointing out that J2 Global had been purchasing "money-losing commoditized cloud computing companies" and combining them with a "nonperforming digital media strategy" to embellish its revenue figures and further that all of the Company's acquisitions within the cloud computing space had been "losing money, with negative organic growth." This analysis of the Company's mergers and acquisitions ("M&A") strategy was in stark contrast to the rosy picture painted by J2 Global's SEC filings and public

---

[1]     https://citronresearch.com/wp-content/uploads/2016/03/JCOM-final-b20.pdf    (last    visited December 2, 2020).

statements that the Individual Defendants had made and caused the Company to make up until this time.

7.     On this news, the Company's stock price dropped by over 19.8%, sinking from $70.99 per share at the close of trading on March 9, 2016, to $56.90 per share at the close of trading on March 10, 2016.

8.     Still, the Citron Report flagged only the potential unsustainability of the Company's M&A program and cast doubt on the accuracy of the Company's accounting practices.  Following the release of this news, Defendants R. Scott Turicchi ("Turicchi"), Nehemia Zucker ("Zucker"), and Vivek Shah ("Shah") continued to, and along with the rest of the Individual Defendants caused the Company to continue to,  make use of improper accounting practices to obscure the Company's financial condition, tout the M&A program's success, misleadingly describe the Company's practice of buying flagging businesses as a "shrink to grow" strategy, and fail to disclose, and even minimize, the conflicts of interest plaguing certain directors as well as a $200 million insider transaction to an investment fund connected to Defendant Ressler.

9.     The full truth was subsequently revealed on June 30, 2020, when Hindenburg Research, a forensic financial research firm known for exposing fraud at publicly-traded companies, published a report on its website (the "Hindenburg Report") alleging that J2 Global's management, in collusion with the Company's conflict-ridden Board of Directors (the "Board") were taking advantage of the Company to engage in "egregious insider self-enrichment."[2] The Hindenburg Report pointed to, among other things, the Company's suspicious and "opaque" accounting treatment of its acquisitions and related impairments, the lack of independence on the part of the Board, and a litany of undisclosed, material related party transactions, some directly

---

[2] https://hindenburgresearch.com/j2-global/ (last visited August 31, 2020).

implicating certain of the Individual Defendants, including Chairman of the Board Defendant Richard S. Ressler ("Ressler").

10.     On this news, the Company's stock price plunged by over 9%, sinking from $69.50 per share at the close of trading on June 29, 2020, to $63.21 per share at the close of trading on June 30, 2020.

11.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to engage in improper accounting practices, and by personally making and/or causing the Company to make a series of materially false and/or misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

12.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

13.     Also in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls over financial reporting.

14.     Furthermore, during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase millions of shares of its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while nine of them engaged in lucrative insider sales, netting combined proceeds of over $51.5 million. Approximately 2,205,779 shares of the Company's common stock were repurchased during the Relevant Period for over $171 million. As the Company's stock was actually only worth $63.21 per share during that time, the price at closing on June 30, 2020, the Company overpaid by over $32 million in total.

15.     In light of the Individual Defendants' misconduct, which has subjected the Company, its Chief Executive Officer ("CEO"), its former CEO, and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuit pending in the United States District Court for the Central District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, the losses from the waste of corporate assets, including through overpayment for stock through repurchases, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

16.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's liability in

the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of J2 Global's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.     Venue is proper in this District because J2 Global is incorporated in this District. In addition, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

21.     Plaintiff is a current shareholder of J2 Global.  Plaintiff has continuously held J2 Global common stock at all relevant times.

### Nominal Defendant J2 Global

22.     J2 Global is a Delaware corporation with its principal executive offices at 700 S. Flower Street, 15th Floor, Los Angeles, California 90017.   J2 Global's shares trade on the NASDAQ under the ticker symbol "JCOM."

**Defendant Shah**

23.     Defendant Shah has served as the Company's CEO and as a Company director since January 2018. He previously served as the CEO of Ziff Davis—a company acquired by J2 Global in 2012. According to the Company's Schedule 14A filed with the SEC on March 26, 2020 (the "2020 Proxy Statement"), as of March 16, 2020, Defendant Shah beneficially owned 750,956 shares of the Company's common stock, which represented 1.54% of the Company's outstanding shares as of that date.   Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Shah owned over $51.6 million worth of J2 Global stock.

24.     For the fiscal year ended December 31, 2019, Defendant Shah received $2,151,811 in compensation from the Company. This included $1,000,000 in salary, $1,123,000 in non-equity incentive plan compensation, and $28,811 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Shah received $45,062,153 in compensation from the Company. This included $1,000,000 in salary, $35,494,000 in stock awards, $7,756,000 in option awards, $783,000 in non-equity incentive plan compensation, and $29,153 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Shah received $3,047,253 in compensation from the Company. This included $661,932 in salary, $2,195,130 in stock awards, $164,299 in non-equity incentive plan compensation, and $25,892 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Shah received $2,829,186 in compensation from the Company. This included $491,667 in salary, $1,700,904 in stock awards, $614,000 in non-equity incentive plan compensation, and $22,615 in all other compensation.

25.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Shah made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 1/16/2018 | 3,000 | $77.63 | $232,890 |
| 2/15/2018 | 3,000 | $76.59 | $229,770 |
| 3/15/2018 | 3,000 | $82.90 | $248,700 |
| 4/16/2018 | 3,000 | $79.70 | $239,100 |
| 5/15/2018 | 3,000 | $84.96 | $254,880 |
| 6/15/2018 | 3,000 | $88.06 | $264,180 |
| 7/16/2018 | 3,000 | $87.81 | $263,430 |
| 8/15/2018 | 3,000 | $81.42 | $244,260 |
| 9/17/2018 | 3,000 | $82.23 | $246,690 |
| 10/15/2018 | 3,000 | $72.55 | $217,650 |
| 11/15/2018 | 3,000 | $71.90 | $215,700 |
| 12/17/2018 | 3,000 | $70.24 | $210,720 |

26.     Thus, in total, before the fraud was exposed, he sold 36,000 Company shares on inside information, for which he received over $2.86 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

27.     The Company's 2020 Proxy Statement stated the following about Defendant Shah:

*Vivek Shah* was elected to J2 Global's Board of Directors in January 2018, where he has also served as Chief Executive Officer since such time. Previously, he served as Chief Executive Officer of Ziff Davis, which J2 Global acquired in 2012. Prior to joining J2 Global, Mr. Shah led the purchase of Ziff Davis in 2010 in partnership with a private equity firm. From 1995 to 2009, Mr. Shah held various management positions at Time, Inc., including Group President, Digital and President of the Fortune/Money Group. Mr. Shah has been named Online Publisher of the Year by MIN, Innovator of the Year by BtoB's Media Business and inducted into MIN's Digital Hall of Fame. He was also named to Crain's Forty under 40 list. Mr. Shah has a B.A. in political science from Tufts University. Mr. Shah's role as J2 Global's Chief Executive Officer and his extensive management experience in the media and technology sectors provides invaluable insight to the Board of Directors.

**Defendant Zucker**

28.     Defendant Zucker served as the Company's CEO from May 2008 until he resigned effective December 31, 2017. From August 2005 to May 2008, he served as the Company's Co-President and Chief Operating Officer. From May 2003 to August 2005, he served as the Company's Chief Marketing Officer. From December 2000 to May 2003, he served as the Company's Chief Marketing Officer and CFO. From 1996 to December 2000, he served as the Company's CFO.

29.     For the fiscal year ended December 31, 2017, Defendant Zucker received $5,384,894 in compensation from the Company. This included $1,082,174 in salary, $3,583,848 in stock awards, $692,000 in non-equity incentive plan compensation, and $26,872 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Zucker received $4,592,447 in compensation from the Company. This included $774,167 in salary, $2,806,476 in stock awards, $990,000 in non-equity incentive plan compensation, and $21,804 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Zucker received $4,723,255 in compensation from the Company. This included $729,286 in salary, $2,300,067 in stock awards, $593,580 in option awards, $1,078,403 in non-equity incentive plan compensation, and $21,919 in all other compensation.

30.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Zucker made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/18/2015 | 6,663 | $81.00 | $539,703 |
| 3/13/2017 | 7,476 | $85.52 | $639,348 |
| 6/1/2017 | 15,000 | $86.33 | $1,294,950 |

31.     Thus, in total, before the fraud was exposed, he sold 29,139 Company shares on inside information, for which he received over $2.47 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

32.     The Company's Schedule 14A filed with the SEC on March 23, 2017 (the "2016 Proxy Statement") stated the following about Defendant Zucker:

> *Nehemia Zucker*, 60, became j2 Global's Chief Executive Officer in May 2008. From August 2005 to May 2008, Mr. Zucker was Co-President and Chief Operating Officer.  From April to August 2005, he served as Co-President, and from May 2003 to August 2005, he served as Chief Marketing Officer. From December 2000 to May 2003, Mr. Zucker served as Chief Marketing Officer and Chief Financial Officer, and from 1996 to December 2000, he served as Chief Financial Officer. Prior to joining j2 Global in 1996, Mr. Zucker was Chief Operations Manager of Motorola's EMBARC division, which packaged CNBC and ESPN for distribution to paging and wireless networks. From 1980 to 1996, he held various positions in finance, operations and marketing at Motorola in the United States and abroad.

**Defendant Turicchi**

33.     Defendant Turicchi has served as the Company's CFO and President since 2008. From June 2007 until May 2008, he served as the Company's Co-President. From August 2005 until June 2007, he served as the Company's Co-President and CFO. From May 2003 to August 2005, he served as the Company's CFO. From March 2000 through May 2003, he served as the Company's Executive Vice President, Corporate Development. From 1998 through 2000, he served as a Company director. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Turicchi beneficially owned 305,017 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Turicchi owned over $20.9 million worth of J2 Global stock.

34.     For the fiscal year ended December 31, 2019, Defendant Turicchi received $4,351,782 in compensation from the Company. This included $750,000 in salary, $2,741,299 in stock awards, $842,250 in non-equity incentive plan compensation, and $18,233 in all other compensation. For the fiscal year ended December 31, 2018, Defendant Turicchi received $4,177,613 in compensation from the Company. This included $715,559 in salary, $2,768,232 in stock awards, $664,250 in non-equity incentive plan compensation, and $29,572 in all other compensation. For the fiscal year ended December 31, 2017, Defendant Turicchi received $3,374,527 in compensation from the Company. This included $636,667 in salary, $2,239,894 in stock awards, $474,500 in non-equity incentive plan compensation, and $23,466 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Turicchi received $3,118,678 in compensation from the Company. This included $578,333 in salary, $1,913,541 in stock awards, $605,000 in non-equity incentive plan compensation, and $21,804 in all other compensation. For the fiscal year ended December 31, 2015, Defendant Turicchi received $3,248,312 in compensation from the Company. This included $537,924 in salary, $1,700,061 in stock awards, $350,060 in option awards, $638,348 in non-equity incentive plan compensation, and $21,919 in all other compensation.

35.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Turicchi made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/16/2015 | 15,000 | $78.58 | $1,178,700 |
| 9/14/2016 | 7,500 | $68.06 | $510,450 |
| 12/14/2016 | 10,000 | $80.90 | $809,000 |
| 3/12/2018 | 20,663 | $84.65 | $1,749,123 |
| 2/15/2019 | 9,808 | $83.60 | $819,949 |
| 5/16/2019 | 10,000 | $86.67 | $866,700 |

| 5/17/2019 | 1,650 | $87.35 | $144,128 |
| 5/20/2019 | 3,976 | $86.82 | $345,196 |

36.     Thus, in total, before the fraud was exposed, he sold 78,597 Company shares on inside information, for which he received over $6.42 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

37.     The Company's 2020 Proxy Statement stated the following about Defendant Turicchi:

> *R. Scott Turicchi*, 56, became J2 Global's Chief Financial Officer in August 2014 and its President in May 2008. From June 2007 until May 2008, Mr. Turicchi was Co-President. From August 2005 until June 2007, he was Co-President and Chief Financial Officer. From May 2003 to August 2005, Mr. Turicchi served as J2 Global's Chief Financial Officer, and from March 2000 through May 2003, he served as J2 Global's Executive Vice President, Corporate Development. Mr. Turicchi served as a member of J2 Global's Board of Directors from 1998 through 2000. From 1990 to 2000, he was with Donaldson, Lufkin & Jenrette Securities Corporation's investment banking department, holding various positions, including Managing Director. Mr. Turicchi is a member of the Board of Directors of Greenhills Software, Inc., a privately held company that develops real-time operating systems. He is Chairman of the Board of Governors of Thomas Aquinas College. Mr. Turicchi also serves on the boards of Lumen Christi Institute and Sanctuary of Culture.

**Defendant Bech**

38.     Defendant Douglas Y. Bech ("Bech") has served as a Company director since November 2000. He also serves as the Chair of the Company's Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee), and as a member of the Compensation Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Bech beneficially owned 145,645 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the

close of trading on March 16, 2020 was $68.82, Defendant Bech owned over $10 million worth of J2 Global stock.

39.     For the fiscal year ended December 31, 2019, Defendant Bech received $300,069 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Bech received $299,938 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $199,938 in stock awards. For the fiscal year ended December 31, 2017, Defendant Bech received $279,970 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $179,970 in stock awards. For the fiscal year ended December 31, 2016, Defendant Bech received $279,968 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $179,968 in stock awards. For the fiscal year ended December 31, 2015, Defendant Bech received $286,209 in compensation. This included $106,250 in fees earned or paid in cash and $179,959 in stock awards.

40.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bech made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 6/12/2017 | 15,000 | $85.86 | $1,287,900 |
| 5/9/2018 | 10,000 | $87.92 | $879,200 |
| 2/15/2019 | 10,000 | $83.26 | $832,600 |
| 2/21/2019 | 4,307 | $85.12 | $366,612 |
| 11/4/2019 | 18,398 | $97.80 | $1,799,324 |

41.     Thus, in total, before the fraud was exposed, he sold 57,705 Company shares on inside information, for which he received over $5.16 million. His insider sales, made with

knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

42.     The Company's 2020 Proxy Statement stated the following about Defendant Bech:

*Douglas Y. Bech* has served as a director of J2 Global since November 2000. From August 1988 through November 2000, he served as a director of eFax.com, a company J2 Global acquired in November 2000. Since August 1997, Mr. Bech has served as Chairman and Chief Executive Officer of Raintree Resorts International, a company that owns and operates vacation ownership resorts throughout North America. Mr. Bech practiced securities and corporate finance law from 1970 until 1997. Mr. Bech has also served as a director of HollyFrontier Corporation since July 2011 and was a director of Frontier Oil Corporation from May 1993 when it merged with Holly Corporation in July 2011. Mr. Bech is the independent presiding director of HollyFrontier. Mr. Bech has served as an independent director of CIM Commercial Trust Corporation since March 2014. Mr. Bech's previous work as a securities and corporate finance lawyer, as a director of other public companies and his current experience as a chief executive officer of a private enterprise engaged in hospitality, resort management services, and sales and marketing in three different countries, provide expertise on corporate governance and a unique perspective to the Board of Directors.

**Defendant Cresci**

43.     Defendant Robert J. Cresci ("Cresci") has served as a Company director since 1998. He also serves as the Company's Lead Independent Director and a member of the Company's Compensation Committee and Executive Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Cresci beneficially owned 107,743 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Cresci owned over $7.41 million worth of J2 Global stock.

44.     For the fiscal year ended December 31, 2019, Defendant Cresci received $300,069 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Cresci received $299,938 in compensation from the Company. This included $100,000 in fees earned or paid in

cash and $199,938 in stock awards. For the fiscal year ended December 31, 2017, Defendant Cresci received $279,970 in compensation from the Company. This included $100,000 in fees earned or paid in cash and $179,970 in stock awards. For the fiscal year ended December 31, 2016, Defendant Cresci received $278,718 in compensation from the Company. This included $98,750 in fees earned or paid in cash and $179,968 in stock awards. For the fiscal year ended December 31, 2015, Defendant Cresci received $274,959 in compensation. This included $95,000 in fees earned or paid in cash and $179,959 in stock awards.

45.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Cresci made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
| --- | --- | --- | --- |
| 5/10/2017 | 9,000 | $88.67 | $798,030 |
| 4/11/2018 | 10,000 | $78.85 | $788,500 |
| 4/18/2018 | 12,779 | $81.63 | $1,043,150 |
| 2/19/2019 | 4,350 | $84.19 | $366,227 |
| 2/19/2020 | 18,281 | $97.22 | $1,777,279 |

46.     Thus, in total, before the fraud was exposed, he sold 54,410 Company shares on inside information, for which he received over $4.77 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

47.     The Company's 2020 Proxy Statement stated the following about Defendant Cresci:

> *Robert J. Cresci* has been a director of J2 Global since 1998. Mr. Cresci has been a Managing Director of Pecks Management Partners Ltd., an investment management firm, since 1990. He currently serves on the boards of OFS Capital Corporation, CIM Commercial Trust Corporation, OFS Credit Company, Inc., and Hancock Park Corporate Income, Inc. Mr. Cresci previously served on the board of

16

Continucare Corporation until 2011 and the board of Sepracor, Inc. until 2009. Mr. Cresci's extensive knowledge of investment management and accounting from his experience with Pecks Management Partners and his experience serving on other public company boards of directors have proven invaluable to the discussion of our Board of Directors regarding investment strategies, accounting issues and public company matters.

**Defendant Fay**

48.     Defendant Sarah Fay ("Fay") has served as a Company director since February 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee) and Executive Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Fay beneficially owned 5,594 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Fay owned approximately $384,979 worth of J2 Global stock.

49.     For the fiscal year ended December 31, 2019, Defendant Fay received $270,069 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Fay received $269,938 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,938 in stock awards.

50.     The Company's 2020 Proxy Statement stated the following about Defendant Fay:

*Sarah Fay* has served as a director of J2 Global since February 2018. Ms. Fay has served as a Managing Director in Boston-based venture capital firm Glasswing Ventures since January 2016. Prior to joining Glasswing Ventures, between May 2009 and January 2016, Ms. Fay was primarily engaged by her board membership and advisor roles, which are described below. From April 2008 to May 2009, Ms. Fay served as Chief Executive Officer of Aegis Media North America, a media and digital marketing communications company. Prior to this position, Ms. Fay served as President of Carat US and Isobar US. Ms. Fay currently serves on the boards of Celtra, Inc., SocialFlow, Narrative/IO and Labviva. Ms. Fay previously served as a director of The Street. In addition, Ms. Fay participates as a board advisor to several

17

startups in the advertising technology space including, Viral Gains, Mavrck, Namely, AdDaptive Intelligence, and associations MITX, Advertiser Perceptions, and the Ad Club of Boston. The Board of Directors believes that Ms. Fay's extensive experience in the media services industry, with particular knowledge of the digital media, marketing, and advertising industries, as well as her service as a director of a number of other companies, makes her a valuable member of the Board of Directors, able to provide unique insight and advice.

**Defendant Kretzmer**

51.     Defendant W. Brian Kretzmer ("Kretzmer") has served as a Company director since July 2007. He also serves as the Chair of the Company's Audit Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Kretzmer beneficially owned 22,373 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Kretzmer owned over $1.53 million worth of J2 Global stock.

52.     For the fiscal year ended December 31, 2019, Defendant Kretzmer received $295,069 in compensation from the Company. This included $95,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Kretzmer received $294,938 in compensation from the Company. This included $95,000 in fees earned or paid in cash and $199,938 in stock awards. For the fiscal year ended December 31, 2017, Defendant Kretzmer received $274,970 in compensation from the Company. This included $95,000 in fees earned or paid in cash and $179,970 in stock awards. For the fiscal year ended December 31, 2016, Defendant Kretzmer received $268,718 in compensation from the Company. This included $88,750 in fees earned or paid in cash and $179,968 in stock awards. For the fiscal year ended December 31, 2015, Defendant Kretzmer received $254,959 in compensation. This included $75,000 in fees earned or paid in cash and $179,959 in stock awards.

53.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kretzmer made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/10/2015 | 6,600 | $78.88 | $520,608 |
| 5/17/2016 | 4,717 | $62.59 | $295,237 |
| 6/8/2016 | 6,600 | $67.70 | $446,820 |
| 8/30/2016 | 6,600 | $67.95 | $448,470 |
| 6/6/2017 | 1,336 | $86.20 | $115,163 |
| 5/9/2018 | 5,942 | $87.25 | $518,440 |
| 3/13/2019 | 6,000 | $84.17 | $505,020 |
| 9/5/2019 | 1,800 | $87.03 | $156,654 |
| 2/19/2020 | 4,968 | $96.54 | $479,611 |

54.     Thus, in total, before the fraud was exposed, he sold 44,563 Company shares on inside information, for which he received over $3.48 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

55.     The Company's 2020 Proxy Statement stated the following about Defendant Kretzmer:

*W. Brian Kretzmer* was elected to J2 Global's Board of Directors in July 2007. He currently operates his own consultancy practice, Kretzmer Consulting LLC, and is an investor in several private firms where he serves in multiple capacities. From 1999 to 2006, Mr. Kretzmer was Chief Executive Officer of MAI Systems Corporation, a provider of enterprise management solutions for lodging organizations. He also served as Chief Financial Officer of MAI Systems Corporation from 1993 to 1996 and 1999 to 2000. Mr. Kretzmer also serves as a director and member of the Audit Committees of each of Cole Office & Industrial REIT (CCIT III), Inc., which invests primarily in single-tenant, mission-critical office and industrial properties that are essential to the day-to-day operations of a company, CIM Real Estate Finance Trust, Inc., (formerly Cole Credit Property Trust IV, Inc.), which invests primarily in income-producing, necessity single-tenant retail properties and anchored shopping centers subject to long-term net leases with national or regional creditworthy tenants, and CIM Income NAV, Inc.

19

(formerly Cole Real Estate Income Strategy (Daily NAV), Inc.), which primarily invests in income-producing necessity commercial real estate across the retail, office and industrial sectors. Mr. Kretzmer is a thirty year veteran in technology industries. Mr. Kretzmer's earlier experiences included extensive accounting experience serving in various positions in cost accounting, plant controllership and corporate controllership. His various experiences provide the Board of Directors a valuable operational and financial perspective and accounting expertise.

**Defendant Miller**

56.     Defendant Jonathan F. Miller ("Miller") has served as a Company director since February 2015. He also serves as a member of the Company's Audit Committee and Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Miller beneficially owned 161,832 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Miller owned over $11.1 million worth of J2 Global stock.

57.     For the fiscal year ended December 31, 2019, Defendant Miller received $270,069 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Miller received $269,938 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,938 in stock awards. For the fiscal year ended December 31, 2017, Defendant Miller received $249,970 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $179,970 in stock awards. For the fiscal year ended December 31, 2016, Defendant Miller received $249,968 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $179,968 in stock awards. For the fiscal year ended December 31, 2015, Defendant Miller received $249,959 in compensation. This included $70,000 in fees earned or paid in cash and $179,959 in stock awards.

58. During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Miller made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 11/6/2019 | 20,000 | $98.57 | $1,971,400 |

59. His insider sale, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrates his motive in facilitating and participating in the scheme.

60. The Company's 2020 Proxy Statement stated the following about Defendant Miller:

> *Jonathan F. Miller* was appointed to J2 Global's Board of Directors in February 2015. Until January 2018, Mr. Miller was a partner at Advancit Capital, where he continues to serve as an advisor and member of the Investment Committee. He previously has served as Chairman and Chief Executive Officer of the Digital Media Group at News Corp., and was its Chief Digital Officer from April 2009 to September 2012. Mr. Miller was a founding partner of Velocity Interactive Group, an investment firm focusing on internet and digital media, from its inception in 2007 to 2009. Prior to founding Velocity, Mr. Miller served as the Chief Executive Officer of America Online, Inc. ("AOL") from 2002 to 2006. Prior to joining AOL, Mr. Miller served as Chief Executive Officer and President of USA Information and Services. Mr. Miller currently is a director of Akamai Technologies, Inc., AMC Networks Inc., and Interpublic Group of Companies, Inc. Mr. Miller previously served as a director of, among others, Houghton Mifflin Harcourt Co., LiveNation Entertainment, Inc., RTL Group SA, Shutterstock, Inc., TripAdvisor, Inc., and Ticketmaster prior to its merger with LiveNation. Mr. Miller is a trustee of the American Film Institute and The Paley Center for Media. Mr. Miller holds a B.A. from Harvard College. Mr. Miller's broad general management background in both the media and technology sectors, as well as his experience with growth companies, brings a diverse and valuable perspective to the Board of Directors.

**Defendant Ressler**

61. Defendant Ressler has served as the Chairman of the Board and as Company director since 1997. He previously served as the Company's CEO from 1997 through 2000. He

also serves as the Chair of the Company's Executive Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Ressler beneficially owned 1,427,585 shares of the Company's common stock, which represented 2.93% of the Company's outstanding shares as of that date.  Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Ressler owned over $98.2 million worth of J2 Global stock.

62.     For the fiscal year ended December 31, 2019, Defendant Ressler received $476,069 in compensation from the Company. This included $276,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Ressler received $475,938 in compensation from the Company. This included $276,000 in fees earned or paid in cash and $199,938 in stock awards. For the fiscal year ended December 31, 2017, Defendant Ressler received $455,970 in compensation from the Company. This included $276,000 in fees earned or paid in cash and $179,970 in stock awards. For the fiscal year ended December 31, 2016, Defendant Ressler received $455,968 in compensation from the Company. This included $276,000 in fees earned or paid in cash and $179,968 in stock awards. For the fiscal year ended December 31, 2015, Defendant Ressler received $478,959 in compensation. This included $299,000 in fees earned or paid in cash and $179,959 in stock awards.

63.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ressler made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 11/24/2015 | 9,131 | $80.10 | $731,393 |
| 11/25/2015 | 21,778 | $80.44 | $1,751,822 |
| 11/27/2015 | 7,484 | $80.84 | $605,007 |
| 11/30/2015 | 34,916 | $80.85 | $2,822,959 |

| 12/1/2015 | 28,918 | $80.53 | $2,328,767 |
| 12/2/2015 | 31,514 | $80.91 | $2,549,798 |
| 12/3/2015 | 17,283 | $80.67 | $1,394,220 |
| 12/4/2015 | 44,734 | $80.74 | $3,611,823 |
| 12/7/2015 | 10,614 | $80.54 | $854,852 |
| 12/9/2015 | 202 | $80.50 | $16,261 |
| 12/10/2015 | 40,275 | $80.59 | $3,245,762 |

64.     Thus, in total, before the fraud was exposed, he sold 246,849 Company shares on inside information, for which he received over $19.9 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

65.     The Company's 2020 Proxy Statement stated the following about Defendant Ressler:

> *Richard S. Ressler* has been Chairman of the Board of Directors and a director of J2 Global since 1997, and served as J2 Global's Chief Executive Officer from 1997 to 2000, serving in each of these capacities pursuant to a consulting agreement between J2 Global and Orchard Capital Corporation ("Orchard Capital"). Mr. Ressler is the founder and President of Orchard Capital, a firm through which Mr. Ressler oversees companies in which Orchard Capital or its affiliates invest. He has served as President of Orchard Capital since 1994. Through his affiliation with Orchard Capital, Mr. Ressler serves in various senior capacities with, among others, CIM Group, LLC (together with its controlled affiliates, "CIM"), a vertically-integrated owner and operator of real estate assets, Orchard First Source Asset Management (together with its controlled affiliates, "OFSAM"), a full service provider of capital and leveraged finance solutions to U.S. corporations, and OCV Management, LLC ("OCV"), an investor, owner and operator of technology companies. CIM Capital, LLC, an affiliate of CIM, OFS Capital Management, LLC, an affiliate of OFSAM, and OCV, are all registered with the SEC as registered investment advisers. Mr. Ressler also serves as a board member for various other public and private companies in which Orchard Capital or its affiliates invest, including as chairman of the board of directors of CIM Commercial Trust Corporation. Since February 2018, Mr. Ressler has also served as the Chief Executive Officer and a director of each of Cole Office & Industrial REIT (CCIT III), Inc. ("CCIT III"), which invests primarily in single-tenant, mission-critical office and industrial properties that are essential to the day-to-day operations of a company, CIM Real Estate Finance Trust, Inc., (formerly Cole Credit Property Trust IV, Inc.) ("CMFT"), which is in the process of transitioning to a mortgage

REIT, by balancing its existing portfolio of income-producing, necessity single-tenant retail properties subject to long-term net leases with national or regional creditworthy tenants with future investments in a portfolio of commercial mortgage loans and other real estate-related credit investments, and CIM Income NAV, Inc. (formerly Cole Real Estate Income Strategy (Daily NAV), Inc.) ("INAV"), which primarily invests in income-producing necessity commercial real estate across the retail, office and industrial sectors. In August of 2018, Mr. Ressler was appointed as Chairman of the Board and as a member of the Nominating and Corporate Governance Committee of CCIT III, CMFT, and INAV. In January 2019, he was appointed to the Board of Directors of Cole Office & Industrial REIT (CCIT II), Inc. ("CCIT II"), which invests primarily in single-tenant mission-critical office and industrial properties that are essential day-to-day operations of a company. Each of CCIT II, CCIT III, CMFT, and INAV is a public, non-listed REIT that is operated by an affiliate of CIM. Mr. Ressler co-founded CIM in 1994 and, through an agreement with Orchard Capital, chairs its executive, investment, credit, allocation and asset management committees. Mr. Ressler co-founded the predecessor of OFSAM in 2001 and, through an agreement with Orchard Capital, chairs its executive committee. Mr. Ressler co-founded OCV in 2016 and, through an agreement with Orchard Capital, chairs its executive committee. Prior to founding Orchard Capital, from 1988 until 1994, Mr. Ressler served as Vice Chairman of Brooke Group Limited, the predecessor of Vector Group, Ltd. and served in various executive capacities at VGR and its subsidiaries. Prior to VGR, Mr. Ressler was with Drexel Burnham Lambert, Inc., where he focused on merger and acquisition transactions and the financing needs of middle-market companies. Mr. Ressler's extensive experience with, and knowledge of, business management and finance are invaluable to our Board's discussion.

**Defendant Ross**

66.     Defendant Stephen Ross ("Ross") has served as Company director since July 2007. He also serves as a member of the Company's Audit Committee and Compensation Committee. According to the 2020 Proxy Statement, as of March 16, 2020, Defendant Ross beneficially owned 15,334 shares of the Company's common stock.  Given that the price per share of the Company's common stock at the close of trading on March 16, 2020 was $68.82, Defendant Ross owned over $1.05 million worth of J2 Global stock.

67.     For the fiscal year ended December 31, 2019, Defendant Ross received $270,069 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $200,069 in stock awards. For the fiscal year ended December 31, 2018, Defendant Ross received

$269,938 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $199,938 in stock awards. For the fiscal year ended December 31, 2017, Defendant Ross received $249,970 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $179,970 in stock awards. For the fiscal year ended December 31, 2016, Defendant Ross received $249,968 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $179,968 in stock awards. For the fiscal year ended December 31, 2015, Defendant Ross received $254,959 in compensation. This included $75,000 in fees earned or paid in cash and $179,959 in stock awards.

68.     During the Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Ross made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 9/13/2016 | 19,836 | $67.82 | $1,345,278 |
| 2/26/2019 | 30,848 | $85.43 | $2,635,345 |
| 2/27/2019 | 2,550 | $85.14 | $217,107 |
| 3/10/2020 | 2,974 | $83.91 | $249,548 |

69.     Thus, in total, before the fraud was exposed, he sold 56,208 Company shares on inside information, for which he received over $4.44 million. His insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

70.     The Company's 2020 Proxy Statement stated the following about Defendant Ross:

*Stephen Ross* was elected to J2 Global's Board of Directors in July 2007. From 1989 to August 31, 2017, he served in various positions with Warner Bros Entertainment, Inc. ("WBE"). His last position with WBE was Executive Vice President – Recreational Enterprises. Until 2009, Mr. Ross also served as a director of Grill Concepts, Inc., a restaurant company. Mr. Ross' more than 20 years of

broad experience with one of the world's premier entertainment companies provides the Board of Directors a unique perspective.

<u>**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

71.     By reason of their positions as officers, directors, and/or fiduciaries of J2 Global and because of their ability to control the business and corporate affairs of J2 Global, the Individual Defendants owed J2 Global and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage J2 Global in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of J2 Global and its shareholders so as to benefit all shareholders equally.

72.     Each director and officer of the Company owes to J2 Global and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

73.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of J2 Global, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

74.     To discharge their duties, the officers and directors of J2 Global were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

75.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of J2 Global, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised J2 Global's Board at all relevant times.

76.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

77.     To discharge their duties, the officers and directors of J2 Global were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of J2 Global were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to J2 Global's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b)       conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)       remain informed as to how J2 Global conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)       establish and maintain systematic and accurate records and reports of the business and internal affairs of J2 Global and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)       maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that J2 Global's operations would comply with all applicable laws and J2 Global's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)       exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)       refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)       examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

78.     Each of the Individual Defendants further owed to J2 Global and the shareholders the duty of loyalty requiring that each favor J2 Global's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

79.     At all times relevant hereto, the Individual Defendants were the agents of each other and of J2 Global and were at all times acting within the course and scope of such agency.

80.     Because of their advisory, executive, managerial, and directorial positions with J2 Global, each of the Individual Defendants had access to adverse, non-public information about the Company.

81.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by J2 Global.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

82.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants caused the Company to conceal the true facts as alleged herein.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

83.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b), and 20(a)

of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price.

84.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of J2 Global was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

85.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

86.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of J2 Global, and was at all times acting within the course and scope of such agency.

## J2 GLOBAL'S CODE OF CONDUCT

87.     J2 Global's Code of Conduct provides that "[a]ll employees and members of our Board of Directors (each a "director") are expected to adhere to those principles and procedures set forth in this Code that apply to them."

88. In a section titled, "Compliance and Reporting," the Code of Conduct states the following, in relevant part:

> Employees and directors are expected to actively monitor compliance with this policy. Employees and directors should strive to identify and raise potential issues before they lead to problems, and should ask about the application of this Code whenever in doubt. Any employee or director who becomes aware of any existing or potential violation of this Code should promptly notify a Company President, Chief Executive Officer, Chief Financial Officer, or Chief Accounting Officer (the "Senior Financial Officers") or the Company's General Counsel, Assistant General Counsel or Director of Internal Audit (we refer to all such contacts collectively as "Appropriate Ethics Contacts"). The Company will take such disciplinary or preventive action as it deems appropriate to address any existing or potential violation of this Code brought to its attention.

89. In a section titled, "Personal Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> A "personal conflict of interest" occurs when an individual's private interest improperly interferes with the interests of the Company. Personal conflicts of interest are prohibited as a matter of Company policy, unless they have been approved by the Company. In particular, an employee or director must never use or attempt to use his or her position at the Company to obtain any improper personal benefit for himself or herself, for his or her family members, or for any other person, including loans or guarantees of obligations, from any person or entity. Service to the Company should never be subordinated to personal gain and advantage. Conflicts of interest should, to the extent possible, be avoided.

90. In a section titled, "Public Disclosure," the Code of Conduct states the following:

> It is the Company's policy that the information in its public communications, including SEC filings, be full, fair, accurate, timely and understandable. All employees and directors who are involved in the Company's disclosure process, including the Senior Financial Officers, are responsible for acting in furtherance of this policy. In particular, these individuals are required to maintain familiarity with the disclosure requirements applicable to the Company and are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to others, whether within or outside the Company, including the Company's independent auditors. In addition, any employee or director who has a supervisory role in the Company's disclosure process has an obligation to discharge his or her responsibilities diligently.

91.     In a section titled, "Compliance with Laws, Rules and Regulations," the Code of Conduct states the following, in relevant part:

> It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each employee and director to adhere to the standards and restrictions imposed by those laws, rules and regulations.
>
> Generally, it is both illegal and against Company policy for any employee or director who is aware of material nonpublic information relating to the Company to buy or sell any securities of the Company, or recommend that another person buy, sell or hold the securities of the Company.

92.     In a section titled, "Corporate Opportunities," the Code of Conduct states the following, in relevant part:

> Employees and directors owe a duty to the Company to advance the Company's legitimate business interests when the opportunity to do so arises. Employees and directors are prohibited from taking for themselves (or directing to a third party) a business opportunity that is discovered through the use of corporate property, information or position, unless the Company has already been offered the opportunity and turned it down. More generally, employees and directors are prohibited from using corporate property, information or position for personal gain or competing with the Company.

93.     In a section titled, "Fair Dealing," the Code of Conduct states the following:

> We have a history of succeeding through honest business competition. We do not seek competitive advantages through illegal or unethical business practices. Each employee and director should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors and employees. No employee or director should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any unfair dealing practice.

94.     In a section titled, "Protection and Proper Use of Firm Assets," the Code of Conduct states the following:

> All employees should protect the Company's assets and ensure their efficient use. All Company assets should be used for legitimate business purposes only. Unless permitted by local laws, regulations (including pursuant to the NLRA), or collective bargaining agreements, use of Company assets for political purposes must be approved by the Company's General Counsel.

95.     In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, and aiding and abetting thereof.  Moreover, nine of the Individual Defendants violated the Code of Conduct by engaging in insider trading. Also in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

96.     Based in Beverly Hills, California, J2 Global purports to be a "leading provider of internet services" worldwide. Specifically, through its Cloud Services business, the Company offers cloud-based subscription services, as well as fax, security, privacy, data backup, email marketing, and voice products support services to businesses and consumers. Through its Digital Media business, the Company also maintains a portfolio of various web properties and apps, such as IGN, Mashable, PC Mag, AskMen, and Everyday Health, which primarily generate revenue through advertising, sponsorships, subscription fees, and licensing fees.

97.     Notably, the Company has an extensive record of mergers and acquisitions, and regularly acquires new businesses as part of the Company's overall business model. In total, J2 Global has acquired approximately 186 businesses since the Company was founded in 1995.

98.     In recent years, the Company's stream of acquisitions has begun to slow, a trend that has become even more pronounced with the onset of the COVID-19 pandemic. This and other adverse trends, including decreasing digital traffic and increasing cloud cancel rates, have resulted in declining revenues and other negative impacts to the Company and its subsidiaries' businesses.

99.     Yet, despite recording multiple goodwill write-downs and millions of dollars in impairments for certain of its subsidiaries over the years, the Company has yet to record any goodwill impairments at the parent level. As described in the Hindenburg Report and herein, throughout the Relevant Period, the Individual Defendants made use of "tricky" accounting practices—including folding subsequent acquisitions into existing subsidiaries—to obfuscate the Company's underperformance.

100.    For instance, J2Global's Everyday Health subsidiary—one of the Company's largest acquisitions to date—suffered a precipitous revenue decline of approximately $83 million in 2017. Though such a decline clearly seems to merit a goodwill impairment, J2 Global has taken no such impairment, and the Individual Defendants instead "papered over" the subsidiary's faltering performance by folding five subsequent acquisitions into Everyday Health.

101.    In addition, a former employee cited in the Securities Class Action made a number of statements which illustrate other ways in which the Individual Defendants failed to disclose certain material information to investors. This former employee worked at the Company from January 2015 to April 2017, during which time he was a General Manager and then was later promoted to Managing Director, Australia & New Zealand.

102.    In this role, this former employee worked with J2 Global's Vice President ("VP") of Corporate Development, Jeroen van der Weijden ("van der Weijden").  This former employee

attested to the fact that van der Weijden was responsible for identifying M&A targets and closing the acquisition deals.

103.    Moreover, this former employee learned that van der Weijden's incentive package was structured to reward van der Weijden based on the number of deals that he closed, rather than the quality or success of the acquired companies which made it so that van der Weijden's personal incentives were not always aligned with the Company's goals or best interest.

104.    According to the former employee, this incentive structure was a cause of concern because information concerning the acquisition process was not widely disseminated throughout the company which led to certain acquisitions being pursued by van der Weijden to fail to integrate successfully into the rest of J2 Global's corporate structure. According to this former employee, van der Weijden's responsibilities stopped after acquisition, which meant that if an acquisition was not successfully integrating, it was not van der Weijden's problem. In this former employee's experience at private equity firms, this was unusual given van der Weijden's role in the Company.

105.    During this former employee's time working in J2 Global's Australia and New Zealand market, the Company acquired at least three businesses including Web24 and AUSweb. Based on his understanding of the industry, this former employee opined that the Company overpaid for Web24 and AUSweb because he believed that van der Weijden valued the deal based upon obsolete income data. After the deals were done, this former employee was responsible for integrating the companies. However, due to AUSweb's poor performance, this former employee was eventually forced to shutter AUSweb and integrate it into Web24.

106.    This former employee reported being told not to publicly discuss any acquisitions, their acquisition price, or their performance, and was further informed that this policy of silence

was an intentional and/or informed decision by the Board to prevent analysts from gathering reliable data at the individual entity level.

107. Moreover, throughout the Relevant Period, and as described in greater detail below, the Individual Defendants concealed from the public a laundry list of dubious related party transactions going back decades—transactions that were approved by a Board with a web of overlapping business relationships and conflicts of interest.

**J2 Global Fails to Disclose Significant Insider Transactions**

*J2 Global Fails to Disclose Related Party Transactions Involving van der Weijden*

108. According to van der Weijden's personal LinkedIn profile,[3] he was responsible for over 135 M&A transactions while serving as VP of Corporate Development at J2 Global from September 2009 until August 2018. As later pointed out by the Hindenburg Report, this means van der Weijden was responsible for nearly 73% of the Company's 186 acquisitions.

109. In March 2004, prior to van der Weijden joining J2 Global, the Company acquired a company called Jump B.V. ("Jump"), based in the Netherlands, for between $1 and $2 million dollars.

110. In March 2014, Jump was reorganized and the resulting company, called "J2 Global (Netherlands) B.V., was registered to van der Weijden's personal residence in the Netherlands— Pieter Pauwstraat 2 A-I 1017ZJ Amsterdam.

111. Later, as revealed in an October 5, 2015 press release issued by the Company, an acquisition was made of a company called "VDW (Netherlands)." What the press release left out, however, was that "VDW" here stood for the full name: Van der Weijden M&A Consultancy B.V. ("VDW"). Like the Jump reorganization, VDW was registered out of van der Weijden's personal

---

[3] https://www.linkedin.com/in/jeroen-van-der-weijden-2331a7/. Last visited December 9, 2020.

residence in the Netherlands. The press release, and the Company's SEC filings, did not reveal the insider transaction even though VDW was named after J2 Global's VP of Corporate Development and was registered out of his personal residence.

112.   VDW, which had purportedly been engaged in "[m]anagement and operational management consultancy," was acquired for an estimated $900,000. However, at the time of purchase VDW had zero employees other than van der Weijden. This means van der Weijden's "management consultancy" business (with no other employees) was acquired by his then-employer where he was in fact already working as a manager. Although the Company later claimed, after the publication of the Hindenburg Report, that van der Weijden was an outside consultant from 2004 when Jump was acquired until 2015 when VDW was acquired, this does not square with the fact that van der Weijden had, in fact, worked as VP of Corporate Development at J2 Global for approximately nine years from 2009 until 2018 and that he was, in addition, a director at a J2 Global subsidiary, J2 UK, from May 2014 to January 2016.

113.   Furthermore, van der Weijden bought a $2.5 million dollar home in California just one month after the acquisition of VDW. In addition, after van der Weijden left the Company, VDW was dissolved in October 2019.

114.   As a result of the VDW acquisition, the Individual Defendants had a duty to disclose the insider transaction and the details surrounding the deal.  A brief comment name-dropping VDW in a press release—without disclosing that it was an insider deal on terms extremely favorable to company insider van der Weijden for a business with seemingly little to offer J2 Global—is plainly insufficient.

***J2 Global Fails to Disclose Related Party Transactions Involving Defendants Ressler, Kretzmer, and Ross***

115.    Defendant Ressler is the Chairman of the Board and has been a director of J2 Global since 1997. He is also the founder and President of Orchard Capital, through which he is the majority equity holder of a number of investment funds.

116.    On September 25, 2017, the Board of J2 Global authorized the Company to invest $200 million into a fund managed by OCV, a fund in which Defendant Ressler was a majority equity holder. The Company's Proxy Statements (defined below) did disclose that Defendant Ressler was "indirectly the majority equity holder" of OCV and further disclosed that Defendant Zucker now had a significant role there, however these disclosures did not reveal the full extent of the insider transaction or the conflicts of interest which numerous J2 Global insiders had with respect to the transaction.

117.    In addition to Defendants Ressler and Zucker having significant roles at both the Company and OCV, Zohar Loshitzer ("Loshitzer") who had been serving as J2 Global's Executive Vice President ("EVP") of Corporate Strategy since 2001, was also a principal at OCV and had been since 2005—a fact not disclosed in the Proxy Statements (defined below). Moreover, Defendant Zucker left his role as CEO of the Company at the end of 2017 to become co-managing principal at OCV, while Defendant Shah took over at the Company. For his first year as CEO, Defendant Shah received over $45 million in compensation, a number which dwarfed Defendant Zucker's final year's compensation of just over $5 million.

118.    The agreement between the Company and OCV provided that OCV use J2 Global's $200 million commitment to make investments and acquisitions for the Company. However, this was largely duplicative of what the Company was already doing with its in-house, and much touted, M&A program. What the OCV arrangement had, that the Company's M&A program did

38

not, was the right for OCV to charge millions of dollars' worth of management fees, which directly benefitted Defendants Ressler and Zucker and EVP Loshitzer as OCV principals. J2 Global paid over $36 million in fees to OCV in 2018 and an additional $29 million in 2019. Moreover, the investment decisions made by OCV, including what might need to be disclosed as insider transactions if J2 Global were to conduct them, were not subject to the same reporting requirements once in OCV's hands.

119.     The  Audit Committee Defendants (defined below), who the Company held out as independent directors, approved the deal with OCV. Notably, however, Defendant's Kretzmer and Ross had undisclosed conflicts.

120.     Since 2007, Defendant Kretzmer, a member of the Audit Committee which approved the OCV–J2 Global deal, has been held out by the Company as an independent director. However, what the Company has not disclosed in its SEC filings is that Defendant Kretzmer's firm, Kretzmer Consulting, did consulting work for Orchard Capital, which owns OCV and is controlled by Defendant Ressler, between 2016 and 2017. Moreover, shortly after Defendant Kretzmer approved the OCV–J2 Global investment agreement, he was named to the board of CIM Real Estate Finance Trust Inc., which was founded by Defendant Ressler. In addition, Defendant Kretzmer was CEO of MAI Systems Corporation from 1999 to 2006, while Defendant Ressler was Chairman of its board and Defendant Ross and EVP Loshitzer were its directors. The Company failed to disclose any of these conflicts which render Defendant Kretzmer non-independent.

121.     Defendant Ross, also a member of the Audit Committee which approved the OCV–J2 Global arrangement, was also held out by the Company as independent. As described above, he and Defendants Ressler and Kretzmer, along with EVP Loshitzer, had an overlapping business relationship at MAI Systems Corporation. But Defendant Ross was the chair of a committee at

MAI Systems Corporation which approved a reverse stock split that increased Defendant Ressler's ownership interest, through Orchard Capital, of that company. Moreover, after that reverse stock split, Defendant Ross's son, Avidan Ross, gained employment as Chief Technology Officer at CIM Group, Inc. ("CIM Group"), a company cofounded by Defendant Ressler.

122.    CIM Group manages another company, CIM Commercial Trust Corp ("CMCT"). At CMCT, Defendant Ressler is chairman, Defendants Bech and Cresci are fellow directors, and the corporate headquarters are the same as OCV—4700 Wilshire Blvd., Los Angeles CA 90010. These relationships and the relationship in the above paragraph have not been disclosed by the Company in any of its SEC filings or in any of its other documents.

### J2 Global Fails to Disclose Related Party Transactions Involving Orchard Capital

123.    Despite the numerous insider transactions and undisclosed conflicts of interest between the Individual Defendants, J2 Global was caused to enter into a $200 million investment arrangement with OCV. This arrangement benefits, in the first instance, Defendants Ressler and Zucker, and EVP Loshitzer as OCV principals.

124.    Orchard Capital, where Defendant Ressler is President and which is the basis of his relationship with OCV, is itself involved in numerous undisclosed insider transactions which call into question the independence of numerous J2 Global directors. Orchard Capital invested in Universal Telecom Services, Inc. ("Universal Telecom") before Universal Telecom dissolved in 2016. At Universal Telecom, Defendant Zucker was President and CEO, EVP Loshitzer had an officer role, and Defendant Kretzmer's firm did consulting work.

125.    At Presbia PLC ("Presbia"), Orchard Capital invested in the company before Presbia filed for delisting and registration termination in 2019. Presbia's board consisted of Defendants Ressler and Cresci as well as EVP Loshitzer in addition to another OCV managing

principal, Mark Yung. EVP Loshitzer was the CEO of two related entities, PresbiaBio, LLC—which shared a corporate address with J2 Global—and Presbia Coopertief, U.A.—which had as its corporate address VP van der Weijden's personal residence in the Netherlands. Moreover, Defendant Zucker was a director as well as the CEO of Presbia's parent company, Presbia Holdings.

126.     Finally, Orchard Capital invested approximately $12 million into Red Carpet Home Cinema ("Red Carpet"). The investment was made on the first day of Red Carpet's corporate existence despite having no revenue to speak of. This was in breach of OCV's guidelines which reserve investments of that amount to companies which "[d]emonstrate revenue traction of $5+ million." Red Carpet was founded by Defendant Ressler's nephew, Benjamin Black, and Defendants Ressler and Zucker were on Red Carpet's board. Suspiciously, the first capital call OCV made to J2 Global came just as Benjamin Black was leaving his role as a principal at OCV to join Red Carpet as their CFO.

127.     OCV has a pattern of other related party transactions and has invested in a number of other companies which have created a conflict of interest for J2 Global's directors. Defendant Zucker serves on the board of By Heart, SafeBreach, and Social Native; and Don Ressler is the Co-CEO of Techstyle Fashion Group.

128.     In light of the numerous conflicts described above, the $200 million dollar investment by J2 Global into OCV was woefully under-disclosed. Rather than just having Defendant Zucker working there with Defendant Ressler "indirectly" owning a majority stake, it serves as a springboard for many of the Individual Defendants to engage in insider transactions while obfuscating their conflicts of interest from reporting requirements.

**Disguising Underperforming Assets**

129. J2 Global has a pattern of not taking impairment charges on its financial statements for underperforming acquisitions. The Individual Defendants are aided in this scheme of avoiding impairments by the Company's practice of bundling acquisitions into consolidated packages, such that their independent accounting cannot be discerned by interested outside parties. The Hindenburg Report quotes an investor relations representative from the Company as stating "[a]ll these tuck in acquisitions, they kind just get shoved in to the broader J2 umbrella, within the business unit, within the division – and they don't really get tracked anymore. It's impossible to track revenue that derives from 'Acquisition Y' versus what was there before. And the costs of course get blended together. It's really hard to track some of these tuck-in M&A."

### J2 Ireland

130. J2 Ireland was a wholly owned subsidiary of J2 Holdings, itself a subsidiary of J2 Global. In 2015, J2 Ireland took a €22.1 million charge. At the same time, J2 Holdings did not take an impairment. J2 Global did not take an impairment nor did it even disclose J2 Ireland's impairment or why the Company did not feel it necessary to translate J2 Ireland's impairment into an impairment at the parent level.

131. From 2016 to 2018, J2 Ireland saw its revenue drop nearly $20 million. Moreover, the value of many of its assets, such as, *inter alia*, Livedrive, Comendo, and WeCloud, declined as well, sometimes to the tune of millions of dollars. However, as of December 31, 2018, J2 Holdings had a goodwill balance of approximately $4.3 million. What portion of that, if any of it, is attributable to the goodwill of its assets is not made clear and J2 Global has not disclosed why this underperformance does not warrant an impairment.

*Everyday Health*

132.    Everyday Health was acquired by the Company in December 2016 for $493 million—the Company's largest ever acquisition. Everyday Health is a digital media company which owns a number of websites which produce health and wellness–related content.

133.    On September 30, 2016, Everyday Health's revenue for the prior twelve months was $254 million. Within the first year of J2's Global's acquisition, revenue had declined to $171 million, representing a drop of about $83 million. While Everyday Health's revenue had improved to $175 million in 2018 and further to $211.3 million in 2019, this was accompanied by J2 Global merging five newer acquisitions, and including their revenues, into Everyday Health.  Even with this injection of business, Everyday Health is below acquisition levels of revenue.

134.    Notwithstanding, J2 Global has not taken an impairment charge at the parent level. The five additions to, as well as two divestitures from, Everyday Health cloud its true financial condition. J2 Global described the 2017 drop in revenue as an example of the Company's "shrink to grow" model. But even once the two divestitures are accounted for, Everyday Health still experienced a revenue decline of $65 million in 2017 compared to the previous year. Still, J2 Global has not taken an impairment or even disclosed the specific reasons why, in light of this precipitous drop, an impairment is unnecessary.

### Non-Independent Board Members

135.    J2 Global holds out all of its directors, with the exception of its CEO Defendant Shah, as independent. However, as described in part above, there are numerous relationships between and among the directors that exist outside of J2 Global and which remain undisclosed by the Company.

136.    To recap, Defendants Ressler and Cresci both served on Presbia's board together at least until its 2019 delisting and registration termination, with Defendant Ressler still serving

on the board (freed from reporting requirements, it is unclear when after the delisting Defendant Cresci left). At MAI Systems Corporation, Defendants Ressler and Ross served on the board simultaneously from 2001, when Defendant Ross joined, to 2006, with Defendant Ressler having been on the board since 1995. During this time, Defendant Kretzmer spent two stints as CFO, from 1993 to 1996 and again from 1999 to 2000, as well as being CEO from 1999 to 2006.

137.   At Universal Telecom, Defendant Ressler served as Chairman of the Board for 17 years from 1999 to 2016 during which time Defendant Kretzmer, through his firm, was a consultant.

138.   At the CIM Group, Defendant Ressler has served as a principal and co-founded the company in 1994, and Defendant Kretzmer has served as a director there since 2018.

139.   At CMCT, which is itself controlled by the CIM Group, Defendant Ressler has served as the Chairman of the board, and has since December 2017, while Defendant Bech has served as a director since March 2014 and Defendant Cresci has served as a director since April 2014.

140.   Due to these overlapping connections, at each of which, aside from Presbia, Defendant Ressler stands atop as chairman, founder, or principal, Defendants Ressler, Bech, Cresci, Kretzmer, and Ross cannot be considered independent particularly because they are liable to favor the interests of Defendant Ressler and themselves over those of the Company. This is all the more true for Defendants Bech, Cresci, Kretzmer, and Ross who rely on Defendant Ressler to make paying positions available for them at his various ventures. Moreover, the appointments to the Company's board of Defendant's Kretzmer and Ross were only made following their prior associations with Defendant Ressler at other companies, which casts further doubt on their ability to act independent of him.

141.   Furthermore, the Company's Audit Committee Defendants (defined below) are unable to effectively and independently carry out its function because of the conflicts of interest of its members. Defendants Kretzmer, Ressler, and Ross worked together at MAI Systems Corporation, Defendant Kretzmer received work from Universal Telecom and Orchard Capital as a consultant, and Defendant Ross's son works in the C-suite of a Ressler controlled company—a job he was granted after Defendant Ross approved a reverse stock split at MAI Systems Corporation which increased Defendant Ressler's ownership. These events all occurred prior to Defendants Kretzmer and Ross joining J2 Global's board.

142.   These numerous conflicts of interest were not disclosed to investors in the Company's SEC filings, or otherwise, with the Company listing Defendant Shah as its only non-independent director. Defendant Kretzmer went so far as to remove from his own personal website the revelation that he had done previous consulting work with OCV.

**The Individual Defendants' Duty to Disclose**

143.   Under applicable SEC rules and regulations, public companies, such as J2 Global, are required to file financial statements that are prepared according to Generally Accepted Accounting Principles ("GAAP") which are promulgated by the Financial Accounting Standards Board ("FASB"). This applies to both annual and interim financial statements.

144.   The requirements of GAAP are codified in part in the FASB's Accounting Standards Codification ("ASC"). ASC 850 provides that "[f]inancial statements shall include disclosures of material related party transactions." This "disclosure shall include [t]he nature of the relationship(s) involved", a "description of the transactions", the "dollar amounts of the transaction", and the "amounts due from or to related parties."

145.   Per SEC Regulation S-X (17 C.F.R. § 210.4-01(a)(1)), financial statements which are not prepared according to GAAP are presumed to be misleading. Moreover, specifically with

regard to related party transaction, SEC Regulation S-X required that the "[a]mounts of related party transactions should be stated on the face of the balance sheet, statement of comprehensive income, or statement of cash flows." In addition it provides that "[i]n cases where separate financial statements are presented for the registrant, certain investees, or subsidiaries any intercompany profits or losses resulting from transactions with related parties and not eliminated and the effects thereof shall be disclosed."

146.    According to SEC Staff Accounting Bulletin No. 99 – Materiality ("SAB 99"), a misstatement on a financial statement is considered material "if there is a substantial likelihood that a reasonable person would consider it important." Moreover, SAB 99 further provides that "intentional immaterial misstatement are unlawful."

147.    In light of the above GAAP, ASC, and SEC rules, regulations, and guidance, the Individual Defendants failed to ensure that the Company's financial statements, for which they signed certifications of accuracy, adequately disclosed a number of related party transactions that would later come to light in the Hindenburg Report.

**<u>False and Misleading Statements</u>**

***October 5, 2015 Press Release***

148.    On October 5, 2015, the Company issued a press release announcing that J2 Global had closed nine acquisitions during the third fiscal quarter of 2015, including, listed under the heading, "Intellectual Property," a business called "VDW." The press release stated the following, in relevant part:

> LOS ANGELES--(BUSINESS WIRE)-- j2 Global, Inc. (NASDAQGS: JCOM), the global provider of Internet services, announced today that the Company completed nine acquisitions in the third quarter of 2015. The acquisitions spanned all of the Company's business units and five countries. As a result of the recent success of its acquisition program coupled with continued operational achievements, the Company is increasing its 2015 revenue and Adjusted Non-GAAP earnings per diluted share (EPS) guidance.

* * *

The acquisitions listed below will grow the Company's global customer base, provide access to new markets and expand j2's product lineup. The acquisitions are:

| Cloud Backup | Cloud Connect | Digital Media | Intellectual Property |
|---|---|---|---|
| LiveVault (USA) | Axiatel (France) | Salesify (USA) | VDW (Netherlands[]) |
| Online Backup Vault (USA) | Popfax (France) | | |
| DSA Technologies (USA) | Network Telsys (Canada) | | |
| Comtech (Norway) | | | |

149.    This press release failed to disclose that the acquisition of "VDW (Netherlands)" was an insider transaction given that, as would later be disclosed in the Hindenburg Report, it was founded by VP van der Weijden. Van der Weijden's initials constituted the corporate name, VDW, the corporation was registered to his personal residence in the Netherlands, and the corporation had no employees at the time it was acquired. Moreover, van der Weijden also served as a director on another of J2 Global's subsidiaries, J2 UK, prior to this transaction. Still, VDW was purchased for about $900,000, apparently all of which went to van der Weijden, and at the time of the press release none of this information was disclosed to potential or current investors.

### November 3, 2015 Earnings Call

150.    On November 3, 2015, Defendant Turicchi stated on the Company's third quarter 2015 earnings call that "[w]e're extremely proud of the accomplishments of our teams during this outstanding quarter where a number of records were set…this continues to validate our overall strategy" and that "part of the art of the teams that we have built is that whether the markets are

strong or weak or the economy is strong or weak, [we know] where to look to find the right kind of deals that will fit our model."

151.    Moreover, Defendant Turicchi went on to say: "[o]ur IP Licensing revenue was roughly flat at $1.1 million. Our contribution of 57% in terms of EBITDA margin I would note that as we've talked about it in the past we continue to make investments in some additional portfolios of intellectual property, which are now actually in the process of commencing their licensing program." This is in apparent reference to the acquisition of VDW, which was announced in the October 5, 2015 press release under the heading "Intellectual Property."

152.    These statements were materially false and/or misleading because they failed to disclose that at the time they were made VP van der Weijden was largely responsible for pursuing the "deals" to fit J2 Global's "model."  However, given that he was already an undisclosed party to a recent related party transaction—and that his pay incentives were structured such that it benefitted him personally to close as many deals as possible, each one increasing his compensation, without regard to the deals' quality or benefit to the Company—touting the record setting number of deals as validation was misleading given the absence of contextualizing information which may have given potential or current investors pause.  In addition, J2 Global's improper accounting painted a rosy portrait of each deal individually, and of J2 Global's financial health as a whole, given that impairments were never taken at the parent level even as various subsidiaries and acquisitions struggled financially.  Moreover, promoting the addition of "some additional portfolios of intellectual property," as well was misleading given that the acquisition at issue was an undisclosed insider transaction that was likely overpaid for.

*November 9, 2015 Form 10-Q*

153.    On November 9, 2015, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2015 (the "3Q15 10-Q"). The 3Q15 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

154.    The 3Q15 10-Q stated that following the Company's review of its unrealized losses to date: "As of September 30, 2015 and December 31, 2014, we did not recognize any other-than-temporary impairment losses."

155.    Moreover, regarding the adequacy of the Company's controls and procedures, the 3Q15 10-Q stated:

> j2 Global's management, with the participation of our principal executive officer and principal financial officer, performed an evaluation of j2 Global's disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934 ("Exchange Act")) as of the end of the period covered by this report. Our principal executive officer and principal financial officer have concluded that j2 Global's disclosure controls and procedures were effective to ensure that information required to be disclosed in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (2) accumulated and communicated to our management to allow their timely decisions regarding required disclosure.

> * * *

> There were no changes in our internal control over financial reporting that occurred during the third quarter ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *February 10, 2016 Earnings Call*

156.    On February 10, 2016, on J2 Global's fourth quarter 2015 earnings call, Defendant Turicchi again touted the success of J2 Global's dealmaking ability.  He stated that "fiscal year

2015 provided stellar operating results, validating our business strategy of…utilizing M&A to more rapidly build these businesses to scale" and that "[o]ur M&A strategy continued to drive both revenue and margin expansion."  Defendant Turicchi went on to promote J2 Global's efforts at integrating two acquisitions, Web24 and AUSweb, stating:

> [Y]ou heard us talk about for several quarters after we bought Web24 that we've been attempting to do a small follow-on acquisition consistent with what we did, we bought KeepItSafe and with that matter when we got Campaigner out of protest. And it took a little longer than we would have liked, but the idea is to do a small transaction that is financially inconsequential. So it's very tiny in terms of its revenue, recall that Web24 itself is only about $5 million of revenue, so it's not very big. But that transaction closed and it's important in that it allows us the opportunity to go through as we do in each new business segment or business unit. What are the real stress points or issues in integration? Because for our model – the way our model works, there is a lot of key variables, but one of them is what is a fair expectation for the time of integration. If it's 30 days versus a year that may very well influence, what you are willing to pay for the business and your ultimate return on invested capital. So having the Web24 business under our ownership for about a year or over a year, we're able to finally acquire an asset. It is in the process of being integrated as we speak in fact likely by the end of this fiscal quarter if not early Q2, it should be integrated.

157.    Defendant Zucker added on that "[w]e have a healthy acquisition pipeline," and that "J2 from an M&A standpoint and from media acquisitioning versus the market will do very good in stress environment or economy."

158.    These statements were materially false and/or misleading because Defendant Turicchi again failed to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction called into question the independence of other deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was. Moreover, the statement promoting the integration of Web24 and AUSweb was materially false and/or misleading due to his failure to disclose that both companies were overpaid for and that van der Weijden's role in acquiring AUSweb may have been motivated not by its ability to successfully integrate with

Web24 but by his desire to maximize the number of deals he closed. Finally, the statement promoting the "healthy acquisition pipeline" and the ability of J2 Global to succeed in a stress environment was materially false and/or misleading given that van der Weijden's involvement in the M&A process, his incentives potentially compromising his ability to pursue deals that benefitted the Company rather than himself, his prior involvement in an undisclosed insider transaction, and J2 Global's improper accounting which painted a rosy portrait of its financial health while failing to take any impairments even as subsidiaries did so.

### *February 29, 2016 Form 10-K*

159.    On February 29, 2016, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K"). The 2015 10-K was signed by Defendants Zucker, Turicchi, Bech, Cresci, Kretzmer, Miller, Ressler, and Ross, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

160.    With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2015 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test

51

is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31, 2015, 2014, and 2013 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

161.   With respect to the Company's accounting evaluation of long-lived and intangible assets, the 2015 10-K stated the following, in relevant part:

We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

***We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2015, 2014 and 2013.***

(Emphasis added.)

162.    The 2015 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2015 Proxy Statement."

163.    The 2015 10-K stated the following regarding the Company's internal controls:

j2 Global's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for j2 Global. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) using the 2013 framework. Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. ***Based on its assessment, management has concluded that j2 Global's internal control over financial reporting was effective as of December 31, 2015.***

* * *

***There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) which occurred during the fourth quarter of our fiscal year ended December 31, 2015 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

164.    These statements were materially false and/or misleading because J2 Global's failure to note any impairment charges was the result of their improper accounting which resulted in J2 Global not taking any impairments at the parent company level even as subsidiaries and acquisitions underperformed and themselves took impairments. Moreover, internal controls were ineffective given that false and misleading statements were being included in J2 Global's financial

reporting. Together, these statements rendered the SOX certification, signed by Defendants Zucker and Turicchi, materially false and/or misleading.

165.    The statements referenced in ¶¶ 148, 150–151, 153–157, and 159–163, herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls.

**The Truth Begins to Emerge as False and Misleading Statements Continue**

***March 10, 2016 Citron Report***

166.    On March 10, 2016, part of this scheme was uncovered when Citron Research published the Citron Report. The Citron Report exposed a number of potential problems with J2 Global's accounting practices by pointing out that "J2 has been buying money-losing commoditized cloud computing companies, combining them with a nonperforming digital media strategy to inflate its top line, as EBIDTA runs in place;" and "[a]ll of [J2 Global's] acquired business in the cloud space seems to have been losing money, with negative organic growth."  This put J2 Global in a position such that it "no longer wants acquisitions, it needs acquisitions." Moreover, such statements as "j2 Global has spent the past four years using the money generated by its legacy eFax business to prop the financials of a collection of unremarkable and/or useless

assets that have all been acquired with terms undisclosed" and "[w]hile Wall Street analysis are tripping over themselves in excitement about the future of M&A at j2 Global, no one seems to be paying any attention to the bottom line or the quality of businesses j2 Global is aggregating" further shook investor confidence in J2 Global's transparency and M&A strategy. This analysis of the Company's M&A strategy was in stark contrast to the rosy picture painted by J2 Global's SEC filings and public statements up until this time.

167.     On this news, the Company's stock price plunged by $14.09 per share, or over 19.8%, sinking from $70.99 per share at the close of trading on March 9, 2016, to $56.90 per share at the close of trading on March 10, 2016.

### March 23, 2016 Proxy Statement

168.     On March 23, 2016, the Company filed the 2016 Proxy Statement. Defendants Bech, Cresci, Kretzmer, Miller, Ressler, and Ross solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

169.     With respect to director independence, the 2016 Proxy Statement stated that "[a]ll of our directors are independent directors as defined in the Nasdaq listing standards and as determined by j2 Global's Board of Directors."

170.     With respect to related party transactions, the 2016 Proxy Statement purported that "[d]uring 2015, j2 Global was not a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K."

171.     With respect to the Company's Code of Conduct, the 2016 Proxy Statement stated, "j2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees

of j2 Global," and that "[t]he Code embodies j2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

172.    The 2016 Proxy Statement was false and misleading because, *inter alia*, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

### *May 5, 2016 Earnings Call*

173.    On May 5, 2016, on the Company's first quarter 2016 earnings call, Defendant Turicchi again touted the companies "Q1 2016 continued to provide outstanding operating results, which continue to validate our overall business strategy of…utilizing M&A to more rapidly build these businesses to scale." He also repeated the boast from fourth quarter 2015 earnings call that the "M&A pipeline for this business and for the Backup business continues to be healthy."

174.    These statements were materially false and/or misleading because they failed to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries took impairments and otherwise struggled financially.

### *May 10, 2016 Form 10-Q*

175.    On May 10, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2016 (the "1Q16 10-Q"). The 1Q16 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the

disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

176.    The 1Q16 10-Q stated that following the Company's review of its unrealized losses to date: "As of March 31, 2016 and December 31, 2015, we did not recognize any other-than-temporary impairment losses."

177.    Moreover, regarding the adequacy of the Company's controls and procedures, the 1Q16 10-Q stated that:

> "As of the end of the period covered by this report, j2 Global's management, with the participation of Nehemia Zucker, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures.  Based upon that evaluation, Mr. Zucker and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q."

* * *

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the first quarter  ended March 31,  2016 that  have  materially affected,  or are reasonably likely to materially affect, our internal control over financial reporting.

### August 3, 2016 Earnings Call

178.    On August 3, 2016, on the Company's second quarter 2016 earnings call, Defendant Zucker stated: "So basically our Rolodex of M&A helps us. And sometimes the prices that we see are very attractive because we do know the business, we don't know the people, we can promise them a fast transaction and reliable transaction without whole base." He continued that, "we have bought a company called Web24 in Australia, which is web hosting. We have not done other deals so far."

179.    These statements were materially false and/or misleading given the failure to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his

participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries took impairments and otherwise struggled financially. Moreover, the statement promoting the integration of Web24 was materially false and/or misleading due to his failure to disclose that it was overpaid for and that van der Weijden's role in acquiring it may have been motivated not by its ability to successfully integrate it with the Company but by his desire to maximize the number of deals he closed.

### *August 9, 2016 Form 10-Q*

180.     On August 9, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2016 (the "2Q16 10-Q"). The 2Q16 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

181.     The 2Q16 10-Q stated that following the Company's review of its unrealized losses to date: "As of June 30, 2016 and December 31, 2015, we did not recognize any other-than-temporary impairment losses."

182.     Moreover, regarding the adequacy of the Company's controls and procedures, the 2Q16 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Nehemia Zucker, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, Mr. Zucker and Mr. Turicchi concluded that these

disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

* * *

There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the second quarter ended June 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *November 9, 2016 Form 10-Q*

183.    On November 9, 2016, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2016 (the "3Q16 10-Q"). The 3Q16 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

184.    The 3Q16 10-Q stated that following the Company's review of its unrealized losses to date: "As of September 30, 2016 and December 31, 2015, we did not recognize any other-than-temporary impairment losses."

185.    Moreover, regarding the adequacy of the Company's controls and procedures, the 3Q16 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Nehemia Zucker, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, Mr. Zucker and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.
>
> * * *
>
> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during

the third quarter ended September 30, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

***February 9, 2017 Earnings Call***

186.    On February 9, 2017 on the Company's fourth quarter 2016 earnings call, Defendant Turicchi bragged that "[o]ur M&A strategy was critical to the overall success of this year. As you know, we completed 22 acquisitions in 2016, spent nearly $600 million, although the crown jewel of the M&A program this year was the acquisition of Everyday Health in December." Moreover, Defendant Zucker touted the Company's revenue and EBITDA growth stating that from "2011 to 2016, our last five years, we achieved approximately 20% compounded revenue growth, and in the Digital Media division and combined, achieved 70% compounded EBITDA growth. We believe that this validates our strategy of focusing on EBITDA, EBITDA generation, utilizing our organic and M&A to build our business."   Defendant Zucker went on to describe how "all the acquisitions were of a relatively smaller companies, when we eliminated a number one cost, which is the platform and the engineers.  Therefore, we are generating high margins.  Also we have – our service is very fully featured. So most of the time when we acquire a company, they are exposed to the new features. And once we take them, the marginal cost to us is not very high."

187.    Defendant Zucker continued that "we are eliminating negative margin revenues as we did in the past. If we don't believe a certain revenue has good margin potential, we will just walk away from it and focus on the profitable parts of the business.  We've already reduced the combined workforce of Ziff Davis and Everyday Health by 7%. We have been steadily terminating or restructuring vendor agreement, which will add several points to the margin already now in 2017. We are undertaking many positive and profit enhancing changes that we will continue to talk about in the next quarters."

188.    Also on the call, Defendant Turicchi further added that:

[W]e're not going to be breaking out Everyday Health just as we don't break out IGN or the tech vertical or Ookla. But what I will say is – and remember, this is very important on the Shrink to Grow concept, it has nothing to do with Cambridge and Tea Leaves. So if you looked at Everyday Health in its totality, it had a revenue guidance/expectation last year around $250 million. We will be shrinking that revenue base by up to about $20 million based on some of the comments Hemi made earlier, where we're not finding that there is either any margin in some of those revenue streams or margins consistent with our approach.... [W]e would expect that off of that reset lower base to experience close to double digit growth with that set of assets.

189.    These statements were materially false and/or misleading because of the failure to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries and acquisitions took impairments and otherwise struggled financially. In the case of Everyday Health, there was shrinking but not growing as revenues dropped by $83 million dollars in the first year and have not wholly recovered.

### *March 1, 2017 Form 10-K*

190.    On March 1, 2017, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K"). The 2016 10-K was signed by Defendants Zucker, Turicchi, Bech, Cresci, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

191.    With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2016 10-K stated the following, in relevant part:

We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. *We completed the required impairment review for the years ended December 31, 2016, 2015, and 2014 and noted no impairment. Consequently, no impairment charges were recorded.*

(Emphasis added.)

192.    With respect to the Company's accounting evaluation of long-lived and intangible assets, the 2016 10-K stated the following, in relevant part:

We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.

We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:

- significant underperformance relative to expected historical or projected future operating results;
- significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
- significant negative industry or economic trends;
- significant decline in our stock price for a sustained period; and
- our market capitalization relative to net book value.

If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.

**We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2016, 2015 and 2014.**

(Emphasis added.)

193.     The 2016 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2016 Proxy Statement."

194.     The 2016 10-K stated the following regarding the Company's internal controls:

j2 Global's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for j2 Global. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) using the 2013 framework. Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. **Based on its assessment, management has concluded that j2 Global's internal control over financial reporting was effective as of December 31, 2016.**

* * *

**There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) which occurred during the fourth quarter of our fiscal year ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.**

(Emphasis added.)

***March 23, 2017 Proxy Statement***

195.     On March 23, 2017, the Company filed its Schedule 14A with the SEC (the "2017 Proxy Statement"). Defendants Bech, Cresci, Kretzmer, Miller, Ressler, and Ross solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

196.     With respect to director independence, the 2017 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

197.     With respect to related party transactions, the 2017 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction," and further indicated that "[s]ince January 1, 2016, j2 Global has not been a party to any transaction that would require disclosure pursuant to Item 404(a) of Regulation S-K."

198.     With respect to the Company's Code of Conduct, the 2017 Proxy Statement stated, "j2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees of j2 Global," and that "[t]he Code embodies j2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

199.     The 2017 Proxy Statement was false and misleading because, *inter alia*, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous

false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

### May 8, 2017 Earnings Call

200.    On May 8, 2017, on the Company's first quarter 2017 earnings call, Defendant Zucker again repeated that "[w]e also successfully launched disaster recovery service and we have a strong M&A pipeline."  Moreover, he again described "[a]t our newest properties, Everyday Health, Media Page Today and What to Expect, we had very productive quarter with new product launches and features. Focus on productivity and profitability, we continued execution of our shrink to grow strategy. This is done by eliminating negative margin activities and eliminating low potential activities. This will result in higher EBITDA against reduced revenue."

201.    During the earnings call, Defendant Turicchi added that:

[W]e would be in line to slightly ahead of our plans in terms of cost reduction. . . . Then there's a second piece, which is a little bit less tangible or less quantifiable, and that is evolving the understanding of how the business is going to operate on a going-forward basis. And I'd say that's a process that takes time. . . . I'd say in the second – or the second piece of it, we're probably tracking, but it's something that takes – it takes months.

202.    Also on the earnings call, Defendant Turicchi additionally stated that:

[I]n term of our mix of M&A, it is correct. The last few quarters, with the exception of Everyday Health, most of the businesses we have bought have been very small. Part of that, I'd say, in the last five or six months has been a function that larger transactions, which we've looked at outside of Everyday Health, have been too expensive. And a lot of that has to do with the correlation to the stock markets either approaching or at all-time highs. So we've tended to focus on smaller deals.

203.    Moreover, on the earnings call, Defendant Turicchi also stated that:

Generally in the cloud, it is the goal not to grow the revenues. In fact, as Hemi will talk about or has talked about, there'll be cases where we'll actually shrink the revenues or we know there'll be revenue decline because of either expected customer attrition or customer attrition upon migration. In the Digital Media business, it usually is the concept of taking the asset, initially shrinking it down to its core, and then from that point growing its revenues.

204.    These statements were materially false and/or misleading because of the failure to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries and acquisitions took impairments and otherwise struggled financially. In the case of Everyday Health's shrinking revenues, Defendant's Zucker and Turicchi's statements are false and/or misleading given that Everyday Health was shrinking revenues even more than anticipated, and that the "shrink to grow strategy" proved an easy way to obscure the fact that the Company's improper accounting still had a bullish outlook even as subsidiaries and acquisitions underperformed, took impairments, and otherwise struggled financially.

### May 10, 2017 Form 10-Q

205.    On May 10, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2017 (the "1Q17 10-Q"). The 1Q17 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

206.    The 1Q17 10-Q reflected a change in the way the Company reported impairments. Rather than straightforwardly asserting, that the Company did not recognize any other-than-temporary impairment losses, the 1Q17 states that "[l]osses associated with other-than-temporary impairments are recorded as a component of other income (expenses)." Because of it being a

component of a greater accounting item, on the relevant line of the "Condensed Consolidating Statement of Income", it is not clear how much of this line item is an impairment charge and how much is actual income losses.

207.    Moreover, regarding the adequacy of the Company's controls and procedures, the 1Q17 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Nehemia Zucker, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures.  Based upon that evaluation, Mr. Zucker and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

> \* \* \*

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the first quarter  ended March 31,  2017 that  have  materially affected,  or  are reasonably likely to materially affect, our internal control over financial reporting.

### *August 3, 2017 Earnings Call*

208.    On August 3, 2017, on the Company's second quarter 2017 earnings call, Defendant Zucker boasted that "Email security and email marketing.… We are seeing in this business the renewed organic growth, increasing margins and M&A."  He continued that, "[t]he integration of Everyday Health and the execution of our strategy remains on target. We are continuing to develop products and building capabilities across the 3 core businesses."

209.    In answering Walter Pritchard, an analyst from Citi, Defendant Zucker and Mr. Pritchard stated the following:

> Pritchard: [Y]ou entered Australia in the Backup market. That market is, organically, not really growing. As we think about sort of your confidence and it feels like you are buying more, maybe not at the rate you were a year ago there, but is that market a market you think can organically grow for the company?

Zucker:     So on the M&A side, we had . . . 2 to 3 companies, each of them were
            $10 million revenue and they were bought by prices that we would never
            think are in our range.

210.     On the call, Defendant Turicchi reemphasized that:

[I]n the Cloud Backup business, we're – it's an art, not a science. But $50 million
to $60 million away and the view and the premise has been that, that will come
from M&A. So there's been less an emphasis on the organic growth potential of
that business or of that space and a much heavier focus on M&A. If you go back
just a few quarters, I think from September of 2015 through probably Q3 of 2016,
the Backup business had at least a dozen transactions around the world that acquired
and then was in the process of integrating.

211.     Defendant Turicchi then reiterated the claim that "[t]he Everyday Health business,

as you know, is in sort of in a shrink to grow mode so the numbers are really not comparable

because you'd have to go back and pro forma into Q2 of 2016 revenue streams that we've now

eliminated. So I'd say it's down a little bit on an actual year-over-year basis, but on a pro forma

basis, would be up. And I think that once we finished the shrink to grow there and we get it down

to the core, then we view it as being a consistent grower with the rest of Ziff Davis."

212.     These statements were materially false and/or misleading because of the failure to

disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his

participation in an undisclosed related party transaction, and that J2 Global's improper accounting

practices made their M&A strategy seem more successful than it in fact was as J2 Global refused

to take impairments at the parent level even as subsidiaries and acquisitions took impairments and

otherwise struggled financially.  Moreover, the statement promoting the Company's efforts in the

Australian Backup market were materially false and/or misleading due to the failure to disclose

that Web24 was overpaid for and that van der Weijden's role in acquiring it may have been

motivated not by its ability to successfully integrate it with the Company but by his desire to

maximize the number of deals he closed. In the case of Everyday Health's shrinking revenues,

Defendant's Turicchi's statements are materially false and/or misleading given that Everyday Health was shrinking revenues even more than anticipated, and that the "shrink to grow strategy" proved an easy way to obscure the fact that the Company's improper accounting still had a bullish outlook even as subsidiaries and acquisitions underperformed, took impairments, and otherwise struggled financially.

### *August 9, 2017 Form 10-Q*

213.     On August 9, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2017 (the "2Q17 10-Q"). The 2Q17 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

214.     The 2Q17 10-Q states that "[l]osses associated with other-than-temporary impairments are recorded as a component of other income (expenses)." Because of it being a component of a greater accounting item, on the relevant line of the "Condensed Consolidating Statement of Income", it is not clear how much of this line item is an impairment charge and how much is actual income losses.

215.     Moreover, regarding the adequacy of the Company's controls and procedures, the 2Q17 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Nehemia Zucker, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures.  Based upon that evaluation, Mr. Zucker and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

* * *

There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the second quarter ended June 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### November 2, 2017 Earnings Call

216.    On November 2, 2017, the Company held an earnings call in connection to the release of J2 Global's financial results for the third quarter 2017. On the call, Defendant Turicchi discussed how "the M&A in Q3 was rather light. A lot of our focus not that we weren't focused on M&A, but the divestitures of Web24 and Tea Leaves were very important even though Tea Leaves actually closed in the fourth fiscal quarter, a lot of the work was done in Q3. So, the M&A transactions on the Cloud side that were done in Q3 will offset to a very modest way some of that $35 million."

217.    Later, in response to this question from Jon E. Tanwanteng from CJS Securities, Inc.—"Could you just talk about the investment rationale in OCV. Do you think you can get a better return there that you can otherwise get in your core M&A strategy, just a little bit more about the decision to go that route?"—Defendant Turicchi replied:

[T]here was an opportunity through this related entity called OCV for us to make an investment and with Hemi moving over into that capacity to also give us confidence of two things, that one, there would be a focus as I'm sure that would have been anyway on delivering high returns and returns consistent with the returns that we are used to experiencing at j2, but giving us greater diversity in terms of the types of transactions that we invest in.

* * *

We think that there's going to be – it will occur of course over time because their investments will have different maturity timeframes, but I think, yes we're going to get those kinds of similar returns and we're going get exposure to other types of transactions that j2 would not find appropriate to do within the j2 structure.

218.    Defendant Turicchi added that the investment with OCV was:

[G]oing to be funded as OCV finds transactions and makes capital calls. So although it's an eight-year fund, we have assumed the more front-end loaded amount of funding you know in the tune of $50 million to $60 million dollars a year on average over the next call it four years to five years. That would exhaust the $200 million commitment. So we look at our estimated free cash flows, obviously looking out a couple of years, the dividend, and feel comfortable that that given the cash balances we already have, will be sufficient to make those capital calls and still do our M&A program.

219.    Finally, Defendant Zucker tacked on that "[w]e made cash-on-cash more than 20% a year on the Web24. So all in, it was a profitable test."

220.    These statements were materially false and/or misleading because they failed to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries and acquisitions took impairments and otherwise struggled financially.  Moreover, the statement promoting the sale of Web24 was materially false and/or misleading due to the failure to disclose that Web24 was overpaid for and that van der Weijden's role in acquiring it may have been motivated not by its ability to successfully integrate it with the Company but by his desire to maximize the number of deals he closed.  Even more, while Defendant Turicchi did disclose, to some extent, that Defendant Zucker would have a role at OCV, he failed to disclose that the investment in OCV would personally benefit a number of the Company's directors who had not-fully-disclosed personal interests in OCV, that there was little legitimate reason for this investment other than the ability of OCV to charge management fees and thus benefit the interested directors, and that though the Board and the Audit Committee both approved the investment, both the Board and the Audit Committee were composed of directors with undisclosed or not sufficiently disclosed conflicts of interest.

*November 9, 2017 Form 10-Q*

221.    On November 9, 2017, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2017 (the "3Q17 10-Q"). The 3Q17 10-Q was signed by Defendants Zucker and Turicchi and contained SOX certifications signed by Defendants Zucker and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

222.    The 3Q17 10-Q states that "[l]osses associated with other-than-temporary impairments are recorded as a component of other (income) expense."  Because of it being a component of a greater accounting item, on the relevant line of the "Condensed Consolidating Statement of Income", it is not clear how much of this line item is an impairment charge and how much is actual income losses.

223.    Moreover, regarding the adequacy of the Company's controls and procedures, the 3Q17 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Nehemia Zucker, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures.  Based upon that evaluation, Mr. Zucker and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

* * *

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the third quarter ended September 30, 2017 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

*February 6, 2018 Earnings Call*

224.   On February 6, 2018, on the Company's fourth quarter 2017 earnings call, Defendant Shah, now CEO, boasted about the Company's investment strategies just as Defendant Zucker had done previously.  Defendant Shah stated: "[o]ur track record has been remarkable, given the number of deals we've done" and "[o]ur organizational approach to M&A is very solid" as "[t]his design allows for a very robust pipeline across the enterprise, while ensuring we maintain our discipline."  Defendant Shah also took the time note J2 Global's relationship with OCV stating:

> [W]e will be getting quarterly updates from OCV as to their activity, and that will be available – or at least some of that will be available directly on their website, which you can access. I think in the scheme of j2, it's actually a relatively small investment. So, if you've heard us talk about these 12 business units, the revenue they're driving and the EBITDA, that's where our focus and attention is going to be as it relates to updates. But there will be information available from time-to-time on the various investments that they are making.

225.   These statements were materially false and/or misleading because, as with previous references to J2 Global's M&A pipeline, they made no reference to van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries and acquisitions took impairments and otherwise struggled financially. Moreover,  while the Individual Defendants downplayed the Company's $200 million commitment with OCV as a "relatively small investment," what remained undisclosed was the fact that the investment in OCV would personally benefit a number of J2 Global's directors who had personal interests in OCV, that there was no legitimate reason for this investment other than the ability of OCV to charge the Company management fees and thus directly benefit certain of J2 Global's interested directors, and that

though the Board and the Audit Committee both approved the investment, both the Board and the Audit Committee were composed of directors with undisclosed or not-sufficiently-disclosed conflicts of interest.

### March 1, 2018 Form 10-K

226.    On March 1, 2018, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K was signed by Defendants Shah, Turicchi, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

227.    With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2017 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is comprised of two steps: (1) a reporting unit's fair value is compared to its carrying value; if the fair value is less than its carrying value, impairment is indicated; and (2) if impairment is indicated in the first step, it is measured by comparing the implied fair value of goodwill and intangible assets to their carrying value at the reporting unit level. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets. ***We completed the required impairment review for the years ended December 31,***

**2017, 2016, and 2015 and noted no impairment. Consequently, no impairment charges were recorded.**

(Emphasis added.)

228.     With respect to the Company's accounting evaluation of long-lived and intangible

assets, the 2017 10-K stated the following, in relevant part:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.
>
> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:
>
> - significant underperformance relative to expected historical or projected future operating results;
> - significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
> - significant negative industry or economic trends;
> - significant decline in our stock price for a sustained period; and
> - our market capitalization relative to net book value.
>
> If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.
>
> **We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2017, 2016 and 2015.**

(Emphasis added.)

229.     The 2017 10-K also purported that information regarding related party transactions

and the independence of the Company's directors was "incorporated by reference to the

information to be set forth in our 2017 Proxy Statement."

230.     The 2017 10-K stated the following regarding the Company's internal controls:

j2 Global's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for j2 Global. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) using the 2013 framework. Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. ***Based on its assessment, management has concluded that j2 Global's internal control over financial reporting was effective as of December 31, 2017.***

\* \* \*

***There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) which occurred during the fourth quarter of our fiscal year ended December 31, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

### March 23, 2018 Proxy Statement

231.    On March 23, 2018, the Company filed a Schedule 14A with the SEC (the "2018 Proxy Statement"). Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross solicited the 2018 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

---

[4] Plaintiff's allegations with respect to the misleading statements in the 2018 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

232.    With respect to director independence, the 2018 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

233.    With respect to related party transactions, the 2018 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction."

234.    The 2018 Proxy Statement disclosed only the following related party transactions:

On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy.  In February 2018, the Company received a capital call notice from the management of OCV for approximately $12.2 million, inclusive of certain management fees.

235.    With respect to the Company's Code of Conduct, the 2018 Proxy Statement stated, "j2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees

of j2 Global," and that "[t]he Code embodies j2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

236.     The 2018 Proxy Statement also called for Company shareholders to, *inter alia*: (1) elect eight directors; (2) ratify the appointment of BDO USA, LLP ("BDO") as J2 Global's independent auditor; and (3) approve, in an advisory vote, the compensation of the Company's named executive officers.

237.     The 2018 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

238.     The 2018 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

239.     As a result of the material misstatements and omissions contained in the 2018 Proxy Statement, Company shareholders, *inter alia*, re-elected Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross which allowed them to continue breaching their fiduciary duties to J2 Global.

### May 10, 2018 Form 10-Q

240.     On May 10, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2018 (the "1Q18 10-Q"). The 1Q18 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

241.     The 1Q18 10-Q states that: "As of March 31, 2018 and December 31, 2017, we did not recognize any other-than-temporary impairment losses."

242.     Moreover, regarding the adequacy of the Company's controls and procedures, the 1Q18 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

> \* \* \*

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the first quarter ended March 31, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### August 9, 2018 Form 10-Q

243.     On August 9, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2018 (the "2Q18 10-Q"). The 2Q18 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure

of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

244.     The 2Q18 10-Q states that: "As of June 30, 2018 and December 31, 2017, we did not recognize any other-than-temporary impairment losses."

245.     Moreover, regarding the adequacy of the Company's controls and procedures, the 2Q18 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures. Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

> * * *

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the second quarter ended June 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### August 10, 2018 Earnings Call

246.     On August 10, 2018, on the Company's second quarter 2018 earnings call, Defendant Turicchi, described the Company's policy in this way:

> …for the most part we do the tuck-in deals. I wouldn't say, they are completely immune, but I would say they are more or less immune from the market dynamics, because often there are other drivers that are influencing the sale of the assets, and there is intangible benefits that the sellers want beyond just the economic dollars, it may be an asset in a portfolio that isn't performing to the PE or VC's liking. And so, for them to be able to get it out of their portfolio of stock allocating time and money to it, is a real benefit, beyond just what's the highest bid, and we've won deals like that, where we're not necessarily the highest bidder, we're still in obtain market multiples, but we are bringing in intangible value to the equity owners.

247.     On the call, Defendant Turicchi also stated:

…we're looking at the M&A a little bit differently maybe that we did in the past, where we are looking into portfolios where we can bring unique and differentiated value to the table, either as it relates to the seller and or is it relates to how we integrated within our existing business units. And so, we can extract value that is unique to us. so, we're not paying a bad multiple from the seller's perspective, it's just we're synergizing it down to that five times EBITDA multiple when the work is done.

248. Defendant Turicchi also returned to the subject of Web24 stating that: "On the Cloud side, we divested Web24 which was our smaller web hosting business in Australia. That had about $1.3 million in revenues in Q2 of 2017. So, combined for the company as a whole, about $11.8 million of revenues from the divested assets were present in Q2, 2017 and not in 2018."

249. These statements were materially false and/or misleading because they failed to disclose that among these possible "other drivers" making these M&A deals happen was van der Weijden's role and his adverse incentive structure as well as his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed. Moreover the "value that is unique to" the Company was, at least in part, attributable to Global's improper accounting practices which made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries and acquisitions took impairments and otherwise struggled financially. Finally, the statements concerning Web24 were materially false and/or misleading because they failed to disclose that the Company overpaid for the Web24 acquisition and that van der Weijden's role in acquiring Web24 may have been motivated not by its ability to successfully integrate Web24 with and therefore benefit the Company but rather by his desire to maximize the number of deals that he closed, and in turn his personal financial gain.

***November 6, 2018 Earnings Call***

250.     On November 6, 2018, on the Company's third quarter 2018 earnings call, Defendant Shah declared that:

> …j2's approach has proven and will continue to prove to be our most important and sustainable competitive advantage. * * * When we consider transactions, we look for fair businesses at great prices and great businesses at fair prices…we typically look to improve the company's margins through our strength through our shrink to grow program, where we identify products, initiatives and activities that are either money losing or have little to no future profit potential. We generally either sunset or sell-off those money losing components. Once we get a business to its most profitable core, we look to develop new monetization streams consistent with what we've accomplished in our other businesses. With great businesses at fair prices, we're focused on helping those businesses accelerate sales and product development. Provide access to our capital for development and tuck in acquisitions and we help them leverage our marketing assets and customer basis.

251.     On the topic of the "shrink to grow" program, Defendant Turicchi added that:

> …once we get through this period where we have got the shrink to grow on some of the assets of mid-single digit. And then I think probably in equal or maybe somewhat greater amount, but on the margin of M&A for the digital media business. But as you know, a lot of those growth rates as it relates to M&A is really a function of the timing of deals and in which side of the two businesses they fall.

252.     Defendant Shah then used as an illustration Everyday Health, stating "[a] great illustration of how we create value is the Everyday Health acquisition we made almost two years ago to the date. We purchased the business for $465 million, then we sold off two non-core and marginally profitable assets for $120 million."

253.     Under questioning from Rishi Jaluria, an analyst from DA Davidson, Defendant Shah elaborated that "I walk[ed] through in the prepared remarks, our experience with Everyday Health, because I thought it was important because I was beginning to get a sense from some shareholders and prospective shareholders that it was a feeling that Everyday Health wasn't working out well, and I couldn't disagree more. We are at 6.6 times EBITDA for a great asset in

a great vertical, and we've done it with some real cyclical pressures. So from my point of view, the business has performed very, very well."

254.    These statements were materially false and/or misleading because they failed to disclose that J2 Global's "approach [that] has proven and will continue to prove to be our most important and sustainable competitive advantage" involved van der Weijden and his adverse incentive structure, that his participation in a previous, undisclosed related party transaction called into question the independence of other M&A deals which provide this so-called "sustainable competitive advantage", and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries and acquisitions took impairments and otherwise struggled financially. Moreover, touting Everyday Health in this manner was materially false and/or misleading because Everyday Health was shrinking revenues even more than anticipated, and that the "shrink to grow strategy" proved an easy way to obscure the fact that the Company's improper accounting still had a bullish outlook even as subsidiaries and acquisitions, including Everyday Health, underperformed and otherwise struggled financially.

### *November 9, 2018 Form 10-Q*

255.    On November 9, 2018, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2018 (the "3Q18 10-Q"). The 3Q18 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

256.     The 3Q18 10-Q states that: "As of September 30, 2018 and December 31, 2017, we did not recognize any other-than-temporary impairment losses."

257.     Moreover, regarding the adequacy of the Company's controls and procedures, the 3Q18 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.
>
> * * *
>
> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the third quarter ended September 30, 2018 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### February 13, 2019 Earnings Call

258.     On February 13, 2019, on the Company's fourth quarter 2018 earnings call, Defendant Turicchi, responding to James Breen from William Blair & Co., stated that "if you look at 2017 versus 2016 [cash flow], there was a big jump up in large part, because of Everyday Health."

259.     This statement was materially false and/or misleading because it failed to disclose that Everyday Health was shrinking revenues even more than anticipated in 2017 from the previous year when it was acquired, and furthermore touting Everyday Health's supposed success obscured the fact that the Company's improper accounting permitted a bullish outlook even as subsidiaries and acquisitions, including Everyday Health, underperformed and otherwise struggled financially.

**March 1, 2019 Form 10-K**

260.     On March 1, 2019, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 10-K"). The 2018 10-K was signed by Defendants Shah, Turicchi, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

261.     With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2018 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is performed by comparing a reporting unit's fair value to its carrying value; if the fair value is less than its carrying value, impairment is indicated. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets.
>
> In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2017 and 2016 and noted no impairment. Consequently, no impairment charges were recorded.***

(Emphasis added.)

262.    With respect to the Company's accounting evaluation of long-lived and intangible assets, the 2018 10-K stated the following, in relevant part:

> We account for long-lived assets in accordance with the provisions of FASB ASC Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses financial accounting and reporting for the impairment or disposal of long-lived assets.
>
> We assess the impairment of identifiable definite-lived intangibles and long-lived assets whenever events or changes in circumstances indicate that the carrying value may not be recoverable. Factors we consider important which could individually or in combination trigger an impairment review include the following:
>
> - significant underperformance relative to expected historical or projected future operating results;
> - significant changes in the manner of our use of the acquired assets or the strategy for our overall business;
> - significant negative industry or economic trends;
> - significant decline in our stock price for a sustained period; and
> - our market capitalization relative to net book value.
>
> If we determined that the carrying value of definite-lived intangibles and long-lived assets may not be recoverable based upon the existence of one or more of the above indicators of impairment, we would record an impairment equal to the excess of the carrying amount of the asset over its estimated fair value.
>
> **We have assessed whether events or changes in circumstances have occurred that potentially indicate the carrying value of definite-lived intangibles and long-lived assets may not be recoverable and noted no indicators of potential impairment for the years ended December 31, 2018, 2017 and 2016.**

(Emphasis added.)

263.    The 2018 10-K also purported that information regarding related party transactions and the independence of the Company's directors was "incorporated by reference to the information to be set forth in our 2019 Proxy Statement."

264.    The 2018 10-K stated the following regarding the Company's internal controls:

> j2 Global's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for j2 Global. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the

Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) using the 2013 framework. Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. ***Based on its assessment, management has concluded that j2 Global's internal control over financial reporting was effective as of December 31, 2018.***

\* \* \*

***There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) which occurred during the fourth quarter of our fiscal year ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

### March 22, 2019 Proxy Statement

265.    On March 22, 2019, the Company filed a Schedule 14A with the SEC (the "2019 Proxy Statement"). Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross solicited the 2019 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[5]

266.    With respect to director independence, the 2019 Proxy Statement stated that "j2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive

---

[5] Plaintiff's allegations with respect to the misleading statements in the 2019 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

267.    With respect to related party transactions, the 2019 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction."

268.    The 2019 Proxy Statement disclosed only the following related party transactions:

On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 pursuant to the Letter Agreement described above, has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy.  In 2018, the Company received six capital call notices from the management of OCV for approximately $36.8 million, inclusive of certain management fees.

269.    With respect to the Company's Code of Conduct, the 2019 Proxy Statement stated, "j2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees of j2 Global," and that "[t]he Code embodies j2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

270.    The 2019 Proxy Statement also called for Company shareholders to, *inter alia*: (1) elect eight directors; (2) ratify the appointment of BDO as J2 Global's independent auditor; and (3) approve, in an advisory vote, the compensation of the Company's named executive officers.

271.    The 2019 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

272.    The 2019 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

273.    As a result of the material misstatements and omissions contained in the 2019 Proxy Statement, Company shareholders, *inter alia*, re-elected Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross which allowed them to continue breaching their fiduciary duties to J2 Global.

### May 8, 2019 Earnings Call

274.    On May 8, 2019, on the Company's first quarter 2019 earnings call, Defendant Turicchi stated, in response to a question from Dan Ives at Wedbush Securities, that "we've seen

continuing strength and firmness out of Everyday health, which has a large chunk of display advertising in terms of its total monetization."

275.    This statement was materially false and/or misleading because it failed to disclose that Everyday Health had shrinking revenues even more than anticipated in 2017 from the previous year when it was acquired and continued to have worse revenues in 2018 than it had pre-acquisition. Furthermore touting Everyday Health's supposed success obscured the fact that the Company's improper accounting permitted a bullish outlook even as subsidiaries and acquisitions, including Everyday Health, underperformed and otherwise struggled financially.

### August 7, 2019 Earnings Call

276.    On August 7, 2019 on the Company's second quarter 2019 earnings call, Defendant Shah stated that:

> I'm not sure of how many companies can make that claim to have grown revenues for 23 consecutive years. Yet, in the seven years that I've been here, and in the 20 years Scott's been here, we still get questioned about the viability of our model, questioned about our ability to sustain the j2 acquisition system, and therefore, our overall growth. I believe the past 20 years should resolve for any rational observer these questions. My favorite indicator of our success is the five times ratio of our accumulative acquisition spend divided by our annual adjusted EBITDA.
>
> It demonstrates our ability to stand capital intently and wisely as well as the means to properly integrate these assets once they are in j2's portfolio.

277.    He continued, that the Company was also willing to sell some of its acquisitions, stating that "we're certainly willing to entertain offers that value these businesses in excess of what the market may be valuing and where we may not feel it's strategic or where we way may not feel we have future growth opportunities or where we may not feel we can execute the M&A program as well. So we're open to it. We get calls from time to time. So we're certainly -- and I do think that's a little bit of a shift."

278.     This statement was materially false and/or misleading because it failed to disclose van der Weijden's role in these M&A deals and his adverse incentive structure, his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries took impairments and otherwise struggled financially.

### *May 10, 2019 Form 10-Q*

279.     On May 10, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2019 (the "1Q19 10-Q"). The 1Q19 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

280.     The 1Q19 10-Q states that: "As of March 31, 2019 and December 31, 2018, we did not recognize any other-than-temporary impairment losses."

281.     Moreover, regarding the adequacy of the Company's controls and procedures, the 1Q19 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures. Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.
>
> * * *
>
> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during

the first quarter ended March 31, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**August 9, 2019 Form 10-Q**

282. On August 9, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended June 30, 2019 (the "2Q19 10-Q"). The 2Q19 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

283. The 2Q19 10-Q states that: "As of June 30, 2019 and December 31, 2018, we did not recognize any other-than-temporary impairment losses."

284. Moreover, regarding the adequacy of the Company's controls and procedures, the 2Q19 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures. Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

* * *

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the second quarter ended June 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**November 1, 2019 Earnings Call**

285. On November 1, 2019, on the Company's third quarter 2019 earnings call, Defendant Shah continued to tout the supposed success of J2 Global's acquisitions stating "we

have a number of high-quality, organically growing businesses where we see runway…. It's our Everyday Health group, which continues to grow organically, high single digits, possibly low double digits on the corporate fax side, on VPN." Moreover, Defendant Shah stated that "[o]ur ability to transact efficiently, transparently, and reliably and to see and create value where others cannot has allowed us to succeed in an M&A environment that can at times seem frothy."

286.    These statements were materially false and/or misleading because they failed to disclose that Everyday Health had shrinking revenues, even more than anticipated in 2017 from the previous year when it was acquired, and continued to have worse revenues in 2018 than it had pre-acquisition.  Furthermore, touting Everyday Health's supposed success obscured the fact that the Company's improper accounting practices permitted a bullish outlook even as subsidiaries and acquisitions, including Everyday Health, underperformed and otherwise struggled financially. In addition, as previously mentioned, touting the success of the Company's M&A program, particularly its efficiency and transparency, was materially false and/or misleading given that, though he had left the Company, van der Weijden's role in numerous M&A deals and his adverse incentive structure remained undisclosed, his participation in an undisclosed related party transaction called into question the independence of other M&A deals he helmed, and that J2 Global's improper accounting practices made their M&A strategy seem more successful than it in fact was as J2 Global refused to take impairments at the parent level even as subsidiaries took impairments and otherwise struggled financially.

### *November 8, 2019 Form 10-Q*

287.    On November 8, 2019, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended September 30, 2019 (the "3Q19 10-Q"). The 3Q19 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants

Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

288.    The 3Q19 10-Q states that: "As of September 30, 2019 and December 31, 2018, we did not recognize any other-than-temporary impairment losses."

289.    Moreover, regarding the adequacy of the Company's controls and procedures, the 3Q19 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures.  Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.

> \* \* \*

> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the third quarter ended September 30, 2019 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

### *March 2, 2020 Form 10-K*

290.    On March 2, 2020, the Company filed with the SEC its annual report on Form 10-K for the fiscal year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Shah, Turicchi, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross, and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

291.    With respect to the Company's accounting evaluation of business combinations, the 2019 10-K stated the following, in relevant part:

> We apply the acquisition method of accounting for business combinations in accordance with GAAP, which requires us to make use of estimates and judgments to allocate the purchase price paid for acquisitions to the fair value of the assets, including identifiable intangible assets and liabilities acquired. Such estimates may be based on significant unobservable inputs and assumptions such as, but not limited to, revenue growth rates, gross margins, customer attrition rates, royalty rates, discount rates and terminal growth rate assumptions. We use established valuation techniques and may engage reputable valuation specialists to assist with the valuations. Management's estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. Fair values are subject to refinement for up to one year after the closing date of an acquisition as information relative to closing date fair values becomes available. Upon the conclusion of the measurement period, any subsequent adjustments are recorded to earnings.

292.    With respect to the Company's accounting evaluation of goodwill and purchased intangible assets, the 2019 10-K stated the following, in relevant part:

> We evaluate our goodwill and indefinite-lived intangible assets for impairment pursuant to FASB ASC Topic No. 350, Intangibles - Goodwill and Other ("ASC 350"), which provides that goodwill and other intangible assets with indefinite lives are not amortized but tested for impairment annually or more frequently if circumstances indicate potential impairment. In connection with the annual impairment test for goodwill, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount. If we determine that it was more likely than not that the fair value of the reporting unit is less than its carrying amount, then we perform the impairment test upon goodwill. The impairment test is performed by comparing a reporting unit's fair value to its carrying value; if the fair value is less than its carrying value, impairment is indicated. In connection with the annual impairment test for intangible assets, we have the option to perform a qualitative assessment in determining whether it is more likely than not that the fair value is less than its carrying amount, then we perform the impairment test upon intangible assets.
>
> In the fourth quarter of 2018, there was a change to our reporting units. As a result of this change, we allocated goodwill to our new reporting units using a relative fair value approach. ***In addition, we completed an assessment of any potential goodwill impairment for all reporting units immediately before and after the reallocation and determined no impairment existed. Further, we completed the required impairment review for the years ended December 31, 2019, 2018 and***

***2017 and noted no impairment. Consequently, no impairment charges were
recorded.***

(Emphasis added.)

293.    With respect to the Company's accounting evaluation of long-lived and intangible

assets, the 2019 10-K stated the following, in relevant part:

> We account for long-lived assets in accordance with the provisions of FASB ASC
> Topic No. 360, Property, Plant, and Equipment ("ASC 360"), which addresses
> financial accounting and reporting for the impairment or disposal of long-lived
> assets.
>
> We assess the impairment of identifiable definite-lived intangibles and long-lived
> assets whenever events or changes in circumstances indicate that the carrying value
> may not be recoverable. Factors we consider important which could individually or
> in combination trigger an impairment review include the following:
>
> - significant underperformance relative to expected historical or projected
>   future operating results;
> - significant changes in the manner of our use of the acquired assets or the
>   strategy for our overall business;
> - significant negative industry or economic trends;
> - significant decline in our stock price for a sustained period; and
> - our market capitalization relative to net book value.
>
> If we determined that the carrying value of definite-lived intangibles and long-lived
> assets may not be recoverable based upon the existence of one or more of the above
> indicators of impairment, we would record an impairment equal to the excess of the
> carrying amount of the asset over its estimated fair value.
>
> ***We have assessed whether events or changes in circumstances have occurred that
> potentially indicate the carrying value of definite-lived intangibles and long-lived
> assets may not be recoverable and noted no indicators of potential impairment
> for the years ended December 31, 2019, 2018 and 2017.***

(Emphasis added.)

294.    The 2019 10-K also purported that information regarding related party transactions

and the independence of the Company's directors was "incorporated by reference to the

information to be set forth in our 2020 Proxy Statement."

295.    The 2019 10-K stated the following regarding the Company's internal controls:

J2 Global's management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) for J2 Global. In order to evaluate the effectiveness of internal control over financial reporting, as required by Section 404 of the Sarbanes-Oxley Act, management has conducted an assessment, including testing, using the criteria in Internal Control – Integrated Framework, issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) using the 2013 framework. Our system of internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. ***Based on its assessment, management has concluded that J2 Global's internal control over financial reporting was effective as of December 31, 2019.***

\* \* \*

***There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934) which occurred during the fourth quarter of our fiscal year ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.***

(Emphasis added.)

### March 26, 2020 Proxy Statement

296.    On March 26, 2020, the Company filed its 2020 Proxy Statement with the SEC. Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross solicited the 2020 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[6]

---

[6] Plaintiff's allegations with respect to the misleading statements in the 2020 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

297.    With respect to director independence, the 2020 Proxy Statement stated that "J2 Global's Board of Directors has determined that all of our directors, other than our Chief Executive Officer, Mr. Shah, are independent within the meaning of the rules of the SEC and the listing rules of the NASDAQ Stock Market."

298.    With respect to related party transactions, the 2020 Proxy Statement purported that "[t]he RPT Policy prohibits all Related-Party Transactions unless they are approved or ratified by the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). If a transaction or relationship constitutes a Related-Party Transaction, the Committee will then review the transaction or relationship to determine whether to approve or ratify the transaction."

299.    The 2020 Proxy Statement disclosed only the following related party transactions:

On September 25, 2017, the Board of Directors authorized the Company to enter into a commitment to invest $200 million in an investment fund (the "Fund"). The manager, OCV Management, LLC ("OCV"), and general partner of the Fund are entities with respect to which Mr. Ressler, Chairman of the Board of Directors, is indirectly the majority equity holder. In addition, Mr. Zucker, who resigned from the position of Chief Executive Officer of the Company effective December 31, 2017 and who serves as an advisor to the Company through December 31, 2018 has become a co-managing principal of OCV and a significant equity holder. As a limited partner in the Fund, the Company will pay an annual management fee to the manager equal to 2.0% (reduced by 10% each year beginning with the sixth year) of capital commitments. In addition, subject to the terms and conditions of the Fund's limited partnership agreement, once the Company has received distributions equal to its invested capital, the Fund's general partner would be entitled to a carried interest equal to 20%. The Fund has a six year investment period, subject to certain exceptions. The commitment was approved by the Audit Committee of the Board in accordance with the RPT Policy. In 2019, the Company received nine capital call notices from the management of OCV for approximately $29.6 million, inclusive of certain management fees. The also Company received approximately $10.3 million in distributions from OCV in 2019.

300.    With respect to the Company's Code of Conduct, the 2020 Proxy Statement stated, "J2 Global's Code of Business Conduct and Ethics applies to all directors, officers and employees

of J2 Global," and that "[t]he Code embodies J2 Global's commitment to conduct its business in accordance with all applicable laws, rules and regulations, and the highest ethical standards."

301.    The 2020 Proxy Statement also called for Company shareholders to, *inter alia*: (1) elect eight directors; (2) ratify the appointment of BDO as J2 Global's independent auditor; and (3) approve, in an advisory vote, the compensation of the Company's named executive officers.

302.    The 2020 Proxy Statement was false and misleading because, despite assertions to the contrary, the Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, and the Individual Defendants' failures to report violations of the Code of Conduct.

303.    The 2020 Proxy Statement also failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

304.    As a result of the material misstatements and omissions contained in the 2020 Proxy Statement, Company shareholders, *inter alia,* re-elected Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross which allowed them to continue breaching their fiduciary duties to J2 Global.

*May 11, 2020 Form 10-Q*

305.     On May 11, 2020, the Company filed with the SEC its quarterly report on Form 10-Q for the quarterly period ended March 31, 2020 (the "1Q20 10-Q"). The 1Q20 10-Q was signed by Defendants Shah and Turicchi and contained SOX certifications signed by Defendants Shah and Turicchi attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

306.     Regarding the adequacy of the Company's controls and procedures, the 1Q20 10-Q stated that:

> As of the end of the period covered by this report, j2 Global's management, with the participation of Vivek Shah, our principal executive officer, and R. Scott Turicchi, our principal financial officer, carried out an evaluation of the effectiveness of the design and operations of our disclosure controls and procedures.  Based upon that evaluation, Mr. Shah and Mr. Turicchi concluded that these disclosure controls and procedures were effective as of the end of the period covered in this Quarterly Report on Form 10-Q.
>
> * * *
>
> There have been no changes in our internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) which occurred during the first quarter ended March 31, 2020 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

307.     The statements referenced in ¶¶168–171, 173, 175–178, 180–188, 190–194, 196–198, 200–203, 205–211, 213–219, 221–224, 226–230, 240–248, 250–253, 255–258, 260–264, 274, 276–277, 279–285, 287–295, and 305–306, herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose, *inter alia*, that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the

Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

#### *June 30, 2020 Hindenburg Report*

308. On June 30, 2020, Hindenburg Research published the Hindenburg Report, which was subsequently updated on July 1, 2020. The report accused J2 Global's management of "open[ing] the door to egregious insider self-enrichment" at the Company, and revealed a number of suspicious related party transactions along with startling director conflicts of interests, none of which had been disclosed by the Individual Defendants. The report further claimed that the Individual Defendants had engaged in a slew of misleading accounting practices in order to conceal certain financial impairments and related underperformance on the part of the Company.

309. The Hindenburg Report described the Company's undisclosed related party transactions as follows, in relevant part:

> **Reality Check: The Stark Reality At J2 Includes Insider Self-Dealing, An Alarming Lack Of Governance Since Inception, Looming Financial Impairments And A Legacy Business In Decline**
>
> Contrary to the picture that the company has painted, we found a vastly different reality at J2.
>
> **Related Party Transactions:** J2 and its executives have a several decades long history of related party acquisitions and undisclosed self-dealing, including:
>
> 1. Using $900 thousand in shareholder capital to acquire a newly-formed entity set up by J2's then VP of Corporate Development. The entity was headquartered

at his personal residence in the Netherlands, and the conflict was never disclosed.

2. Committing $200 million of shareholder cash to the J2 Chairman's newly-formed VC firm despite a consistent track record of prior investment failures. J2 expects to commit an additional $100 million, for a total of $300 million.

3. One of the earliest investments made by the VC vehicle, an estimated $12 million, was to an entity whose incorporation documents list J2 Chairman Richard Ressler's nephew and lawyer – an indirect related party transaction. We discuss this entity in more detail below.

4. J2 Chairman's track record includes the initial backing, majority ownership, directorship and affiliated executive role in publicly traded biotech company called Presbia that itself **operated a newly-formed entity out of the exact same personal residence owned by J2's VP of Corporate Development.** That company has seen its stock fall ~99% in the last 5 years.

5. Previously, J2 had acquired yet another entity based out of the same employee's personal residence back in 2004.

To reiterate**: J2's former VP of Corporate Development had formed 3 entities out of his house that were then acquired/operated by J2 and another company headed by J2's Chairman that cost/incurred losses totaling an estimated $11 million.**

That same VP of Corporate Development was responsible for 135 M&A transactions at J2, according to his LinkedIn profile. That number represents ~73% of the acquisitions in the company's history.

J2 has historically provided limited disclosure to investors on its acquisition portfolio, raising the prospect of broader malfeasance given 1) this individual's oversight of these transactions and 2) the close ties he had with the company's Chairman. He was also integral in J2's European expansion, helping J2 acquire dozens of businesses. Contrary to sell-side perception, many of these businesses have shown significant fundamental deterioration and warrant further impairment testing.

\* \* \*

In October 2015, J2 announced in a press release that it had acquired 9 businesses. Among the acquisitions, listed under "Intellectual Property" on the press release, was a company called VDW (Netherlands).

\* \* \*

102

J2's 2015 annual report did not mention the transaction by name or give any more color on it. Since the press release tucking it in with eight other acquisitions was the only evidence we could find of the transaction, it was easy to miss.

The company only reported the initials of the entity, "VDW". Its full name, according to Dutch corporate records, is actually **Van d**er **W**eijden M&A Consultancy BV. It was set up 11 months earlier, in December 2014, in the name of long-time J2 employee Jeroen **van d**er **W**eijden, according to the same records. Perhaps that is why the company thought "VDW" was a better choice for its disclosures.

The company was registered to Van der Weijden's personal residence in Amsterdam (at Pieter Pauwstraat 2A-H), according to the same corporate records, and listed a total of zero employees.

* * *

The company never disclosed the purchase price for VDW, but based on an analysis of the price of the other transactions that quarter we estimated the number.[] We emailed the company asking to provide the number and had not received a response as of publication.[]

Following publication, the company disclosed the purchase price. It also stated that Jeroen was a consultant not an employee, contrary to the representation on his LinkedIn profile.

We urge the company to provide shareholders and its auditors full detail on this transaction along with any additional conflicted transactions.

As we will show, this personal residence housed four different businesses: (1) J2 Global NV (2) VDW (3) Presbia (discussed below), and (4) a business run by Jeroen's brothers.

**The Acquired Entity Was Dissolved Shortly After the Employee Left the Firm**

Jeroen left J2 in 2018, according to his LinkedIn profile. The Netherlands Chamber of Commerce registry for VDW says that the corporation had been dissolved shortly thereafter, effective October 18, 2019.

Given that Jeroen was already working for J2 as an M&A advisor, per his Linkedin Profile, we found it tremendously odd that the company acquired his M&A advisory consultancy firm, without disclosing the obvious conflict, then just dissolved the entity shortly after he left. In the company's response post-publication, it stated the dissolving corporate entities following acquisition is normal.

103

Lastly, and perhaps most troubling, Jeroen held key responsibility for the 135+ acquisitions he oversaw while at J2. We only went through a fraction of the deals (largely because of J2's opaque disclosures) and found obvious red flags. Per Jeroen's LinkedIn profile, he managed:

*"Sourcing and handling over 135 M&A transactions, while managing all aspects of the acquisition process from scoping, planning, execution, follow up, and reporting."*

Note that J2 has completed 186 acquisitions, suggesting that Jeroen, who was apparently the beneficiary and key participant in an undisclosed related-party transaction, was involved in over 73% of J2's acquisitions.  Given that the audit committee nor the head of M&A appear to be functioning appropriately, it is our view that independent and external parties should conduct investigations on each and every one of the 135 deals that Jeroen oversaw.

* * *

In 2004, J2 paid roughly $1 million to $2 million to acquire Jump B.V. [], an entity based in the Netherlands founded by its eventual VP of Corporate Development, Jeroen Van der Weijden (for context, this ~$1-2m was 1-2% of the then JCOM revenue). Per J2's filings, Jump was described as a provider of fax-to-email and unified messaging services, which fits with J2's primary focus at the time.

Per Dutch corporate records, Jump was later reorganized as J2 Global Netherlands, and was based at the exact same residential apartment that later J2 acquisition VdW was registered (along with the subsidiary of Presbia mentioned earlier)[.]

* * *

We reiterate: Why did J2 and its related individuals acquire multiple entities run by the same individual based out of the same residence?

(Emphasis in original.)

310.    The Hindenburg Report also detailed certain material transactions that specifically implicated Defendant Ressler, stating the following:

**Two years after the VDW acquisition, J2 continued its string of insider self-dealing with a massive allocation of cash to an investment entity controlled by insiders**

Two years after the VDW acquisition, J2 continued its string of insider self-dealing with a massive allocation of cash to an investment entity controlled by insiders.

In 2017, J2 committed $200 million of shareholder funds to Orchard Capital Ventures ("OCV"), a venture capital fund formed in the prior year by J2's Chairman Richard Ressler. Ressler is OCV's majority equity owner despite J2 comprising almost 77% of the equity of the fund.[]

The deal was approved by J2's audit committee [], which as we detail further in Part II, likely unbeknownst to investors, appears heavily conflicted.

It might seem strange that (once again) **J2 is paying millions to its own insiders to invest in ventures**, given that **J2 is already in the business of investing in and acquiring other ventures**.

* * *

Given that the newly-formed OCV had no track record, we explored Ressler's track record outside of J2 in order to understand whether the massive diversion of resources to his firm was the best possible use of investor capital.

We found that Ressler's other venture investments comprised a remarkable string of investment failures, marred by signs of related-party transactions and forms of self-enrichment. A brief case study of his investment in a company called Presbia follows. (In Appendix A we break down Ressler's track record – in summary, 10/12 investments were 0s or near 0s.)

Other venture investors seem to have come to the same conclusion on Ressler's track record. In January 2018 (shortly after J2's massive allocation to OCV was signed), J2's CFO, Scott Turicchi, stated that OCV would raise a further $100m+ dollars from other investors – predominantly on the back of Ressler being a "savvy investor".[]

That interest never seemed to materialize however. Per OCV's 2020 ADV filing with the SEC, it manages around $240 million, meaning that J2's commitment likely will make up almost 85% of the firm's gross assets.

---

**Transcript from the William Blair Conference**

Q: It still doesn't make sense to me for a company that is an operating company and is successful at operating businesses, to turn into a passive investor along with (50) billion dollars, private equity dollars that are out there chasing deals, why can't you just stick to what you do?

A: Well, I think it's just another means for us to invest our capital. So I understand there may not be an agreement on that, but...

Q: Why do you think you'll be better than the other [private equity funds]?

A: It's not us by the way. It's not us. **It's our capital though entrusted to particularly our Chairman, who has been a very savvy investor over a very long timeframe** and the team that he's built around it under a company called OCV. So look it's a business decision that the company has made. We think it will pay off over time. We'll have to see.

Q: **So why couldn't he have raised the funds himself?**

A: **He could. He did raise some funds independent of us.**

Q: So why has this happened?

---

* * *

### Inside OCV's Portfolio: An Estimated $12 Million Investment in a Niche Home Movie Business Formed By Ressler's Nephew (That Now Appears to be Dormant)

So what investments are J2 paying OCV to manage? One example is Red Carpet Home Cinema, a niche business formed by Ressler's nephew that allows the ultra-wealthy to screen movies in their homes for a $10,000 set up fee and $1,500 per movie.

Per his LinkedIn, Richard Ressler's nephew, working for OCV as a Principal, became CFO of Red Carpet just as J2 got its first capital calls from OCV. [] He also set up the entity itself, according to California registration documents. OCV principals comprise half the board at the firm.

Red Carpet seems to also be a rather odd fit. The entity was a brand new startup with no revenue[], which violates OCV's own investment guidelines[.]

(Emphasis in original.)

311.    The Hindenburg Report commented on the numerous conflicts among the purportedly independent members of the Company's Board as follows, in relevant part:

**Corporate governance appears to be non-existent—Clear Conflicts Among Independent Board Members**

The current situation at J2 has been enabled by a corporate governance vacuum. The Chairman and multiple "independent" board members, including the chairs of the audit and compensation committees, have numerous overlapping business interests, calling their actual independence into question.

## Conflicts Among "Independent" Board Members

| Company<br><br>J2 Global Position | End Result/Increase (Decrease) in Value | Richard Ressler<br><br>Independent Chairman | Brian Kretzmer<br><br>Independent Director/ Audit Cmte Chair | Stephen Ross<br><br>Independent Director/ Audit Cmte | Doug Bech<br><br>Independent Director/ Comp Cmte Chair | Robert Cresci<br><br>Independent Director |
|---|---|---|---|---|---|---|
| J2 Global | TBD | ✔ | ✔ | ✔ | ✔ | ✔ |
| Presbia | (99.9%); (Delisted) | ✔ | | | | ✔ |
| MAI Systems Corp. | (99.9%) | ✔ | ✔ | ✔ | | |
| Universal Telecom Services, Inc. | Dissolved | ✔ | ✔ | | | |
| CIM Group | ~3.8% Annl Rtn | ✔ | ✔ | | ✔ | |

1. **"Independent" Chairman Richard Ressler** has outside business ties with much of the board, along with multiple J2 executives. As noted above, Ressler's new investment firm Orchard Capital Ventures ("OCV"), which itself is staffed with senior J2 executives, received a $200 million commitment from J2's shareholders, with the expectation that it will increase to $300 million. [] The transfer was approved by J2's audit committee [], which is Chaired by long time Ressler associate Brian Kretzmer.

2. **"Independent" director and audit committee chair, Brian Kretzmer**, has a work history with J2 Chairman Richard Ressler dating back nearly three decades.

Most importantly, Kretzmer consulted for the OCV affiliate Orchard Capital. This is a flagrant conflict of interest, given that as chair of the audit committee Kretzmer then approved the $200 million commitment of J2 Capital to OCV.

This conflict was not disclosed to investors. Instead, it appears steps were taken to conceal it. Kretzmer removed his role at Orchard from his personal website, but we can see from an earlier Google cached version that Kretzmer worked on M&A for Orchard Capital:



Beyond working for the predecessor entity of a $200 million related-party transaction that he "independently" approved, Kretzmer had additional ties to Ressler. Kretzmer was CEO of IT company MAI Systems Corp while Ressler was Chairman. [] Kretzmer was also a Director at investment company CIM Real Estate Finance Trust, founded by Ressler. He also worked with telecommunications company Universal Telecom, one of Ressler's former portfolio companies.

3.  **"Independent" director and audit committee member, Stephen Ross**, has a 20-year history with J2 Chairman Ressler and director/audit committee chair Kretzmer. Ross served as director at MAI Systems together with Ressler (Chairman) and Kretzmer (CEO & President). Ross's son was also employed at CIM Group, where Ressler was Chairman, eventually becoming CTO.[]

Note again that the "independent" audit committee, whose chairman and majority of its members had multiple overlapping business ties with Ressler, were responsible for providing the approval of $200 million in J2 cash being directed into Ressler's newly-formed investment entity.

Years ago, while serving at MAI systems, Ross Chaired a special committee that approved a reverse stock split deal that explicitly benefited Ressler. []

Kretzmer and Ross were hired to the J2 board on the same day 13 years ago.

4.  **"Independent" compensation committee chair,** Douglas Bech, also serves as director/chairman of the corporate governance committee at CIM Commercial Trust, a business founded by J2 Chairman Richard Ressler.

**Corporate governance appears to be non-existent—Clear Conflicts Between the "Independent" Board Members and The Executives They Are Supposed to Be Overseeing**

## "Independent" Board's Intertwined Interests With J2 Executives

| Company | End Result/Increase (Decrease) in Value | Richard Ressler | Brian Kretzmer | Zohar Loshitzer | Hemi Zucker |
|---|---|---|---|---|---|
| **J2 Global Position** | | Independent Chairman | Director / Chair Audit Cmte | EVP Strategy | Ex-CEO |
| Presbia | (99%); (Delisted) | ✔ | | ✔ | |
| MAI Systems Corp. | (99%) | ✔ | ✔ | ✔ | |
| OCV Management | $200m commitment from J2 | ✔ | | ✔ | ✔ |
| Universal Telecom Services, Inc. | Dissolved | ✔ | ✔ | ✔ | |
| Environmental Solutions Worldwide | (99%); (Delisted) | ✔ | | ✔ | |
| Vantage Surgical Systems | Quietly disappeared | ✔ | | ✔ | |
| Orchard Telecom, Inc. | Quietly disappeared | ✔ | | ✔ | |

**The company's auditor, BDO,** has collected increasing audit fees while apparently staying silent on potential conflicts and clear looming write downs. Total audit fees that J2 Global has paid to BDO have more than doubled to $4.4 million in 2019 from $2.1 million in 2016.

(Emphasis in original.)

312.    Regarding the Individual Defendants' use of misleading accounting practices, including the failure to disclose certain goodwill and intangible impairments, the Hindenburg Report stated the following, in relevant part:

**Undisclosed Goodwill & Intangible Impairments:** Whereas J2 hasn't recognized goodwill impairments at its parent level, audits at J2's subsidiaries show a slew of goodwill impairments. We have also found signs that multiple acquisitions are clearly underperforming and likely necessitate obvious impairments that haven't been taken.

1.  As one example, a key J2 subsidiary recorded an €22 million impairment despite zero goodwill impairment recognized at the parent corporation.

2.  Of J2's 14 "feature" web-based brands, 9 have seen Alexa traffic rankings plummet in the past several years, making them obvious candidates for goodwill impairments.

3. Trouble with the perfect acquisition machine:
   - Everyday Health, J2's largest acquisition, saw an immediate post-acquisition revenue drop of ~25%, yet no impairment was recorded. Instead, J2 went on a spree of asset disposals/acquisitions that obfuscated the entity's financial position.
   - J2's key European subsidiary has seen its revenue decline 27% in the past 3 years, with operating income swinging from €5.2 million to negative €11.5 million.

4. VDW, a dissolved undisclosed related-party transaction that should likely be a full write-off.

5. The VC vehicle J2 has invested in has an asset that appears to be a conflicted related party. A former employee we spoke with said the operations are currently dormant and its staff have been laid off. (Note that another of the VC vehicle investments is down 50% since IPO which will reflect on the financials on a mark-to-market basis.)

Even though the company has completed $2bn of acquisitions since 2012, mostly in digital media (and cloud services businesses), J2's predominant legacy fax segment still represented 64% of LTM operating income. Last quarter, it accounted for 83% of operating income despite the time, cash, and assumed debt through J2's acquisition spree.

Approximately ~$700m of acquisitions for which we have visibility are seeing revenue declines, appear to be underperforming, or have been outright dissolved. That is approximately 1/3 of acquisitions completed since 2012 (of $2bn) – yet we have seen no impairment of goodwill to date. We estimate $155 million in impairments across this subset based on our review. If extrapolated across the acquisitions for which we have zero to little visibility the picture likely worsens.

The disproportionate underperformance of the marquee Everyday Health acquisition should round-out the need for investigation. The opaque nature of J2's M&A program has also left investors in the dark on the magnitude of insider enrichment and fundamental deterioration of the underlying businesses.

\* \* \*

## Part II: Tricky Accounting: J2's Public Entity Has Never Recognized Any Goodwill Impairments

J2 has impairment reviews on a yearly basis, yet we see no impairments to goodwill or intangibles on its acquisitions for the last decade. []

\* \* \*

Our review uncovered multiple examples of goodwill write-downs and impairments at subsidiary levels that are simply not carried up to the parent company financials. Post-publication, the company stated the lack of reported parent impairments is because "J2 assesses the fair value of goodwill at one level below the segment level which is the business-unit level."

\* \* \*

**J2's Largest Acquisition, Everyday Health, Was Acquired in 2016 for $493 Million. It Saw an Immediate Annual Revenue Decline of ~25%.**

**J2 Has Yet to Record An Impairment. Instead, Everyday's Financials Have Been Obfuscated Through A Series of Acquisitions And Divestitures**

In December 2016, J2 acquired Everyday Health for $493.7 million, its largest-ever acquisition. []

\* \* \*

The public financials of Everyday Health show that LTM revenue up until September 2016 (months before the acquisition) was $254 million []. The 2017 numbers declined precipitously (to $171 million), but rather than recognizing the underperformance and taking a goodwill impairment, J2 went on a spree of divestitures and acquisitions in the division that effectively obfuscated the reported metrics.

The company explained the 2017 dip by calling it a period of "shrink to grow" where it was divesting assets.

But even after factoring the 2 divestitures from that year, year over year revenue in the division declined by an estimated $65 million, or 25%.[]

\* \* \*

Revenue in the Everyday Health division still has not reached its pre-acquisition levels despite the 5 subsequent acquisitions folded into the subsidiary.

Such a steep revenue decline seems to clearly warrant a goodwill impairment, yet the company has taken none to date.

Once again, this is J2's largest acquisition and shows clear signs of impairment. Rather than addressing it, a slew of new M&A deals have simply papered over the issue.

**Tricky Accounting: A Wholly Owned Subsidiary of J2 Reported €36 Million (~$50 Million USD) in Impairments, Yet the Parent Reported None. (This Shouldn't Be Possible)**

For example, subsidiary **J2 Global Holdings** is the 100% owner of entity **J2 Global Ireland**. [] The parent shows zero impairments in 2015, but the latter—a wholly owned subsidiary—shows €22 million in impairments in the exact same year. This shouldn't be possible. Post-publication, the company stated that this occurs because "J2 assesses the fair value of goodwill at one level below the segment level which is the business-unit level." The end result is that the reported parent financials don't report goodwill impairments.

\* \* \*

Cumulatively, we found 36 million Euro (~US$50 million) of impairments at the subsidiary level that did not seem to make it to J2 Ireland's parent. J2 Ireland's parent shows no impairments (or diminution) to its investments as of our latest data for the year ended 2018. Inclusive of vdW, we have identified four dissolutions of acquired entities at the subsidiary level.

\* \* \*

Filings across multiple European subsidiaries shows several acquisitions have had significant revenue declines. These European acquisitions and entities look to have been supervised by Jeroen – the key man in a series of suspicious transactions described earlier.

All told, it seems that multiple J2 European assets are deteriorating, yet we have seen no goodwill impairments recorded at the parent level.

(Emphasis in original.)

313.    The Hindenburg Report summarized Hindenburg's conclusions as follows, in relevant part:

- J2 is a digital media roll-up that has acquired 186 businesses since its inception. Its CEO describes the company's "acquisition system" as its "single great competitive advantage".
- We suggest the contrary and believe J2's opaque acquisition approach has opened the door to egregious insider self-enrichment, which we approximate totals $98 million to $128 million based on publicly available information.
- For example, we uncovered that J2 acquired a newly formed entity based out of its own VP of Corporate Development's personal residence for $900 thousand. The entity had undefined "intellectual property" and no employees or apparent assets. **No conflict was disclosed.**
- The VP of Corporate Development who was on the receiving end of the payday handled 135 of J2's acquisitions, representing ~73% of the company's acquisitions to date.

112

- It appears to be a pattern. J2's Chairman formerly controlled a different publicly traded company alongside the noted VP, stacked with various J2 board members and insiders. Its European subsidiary racked up ~€14 million in losses despite having virtually no assets. The entity was **based out of the same personal residence** and was also acquired in part through a related party transaction with the Chairman. The stock of the parent company is down ~99%.

- J2 recently committed $200 million of shareholder cash to a newly-formed investment vehicle run by its Chairman, who has a track record of venture investment failures. The investment vehicle's leadership includes other J2 execs and insiders. J2 expects to commit another $100 million to the vehicle.

- That investment vehicle, in turn, made its first investment of an estimated $12 million into a newly-formed home video business established by the Chairman's nephew. That business is already dormant, according to a former employee.  **Once again, no conflict was disclosed.**

- Despite J2's proxy describing all but one of its board members as "independent", we found decades of intertwined financial interests between board members and executives, calling that independence into question.

- Concurrently, a slowing stream of acquisitions has helped to unearth a decline in J2's key business metrics: digital traffic is down (despite support from recent acquisitions), and cloud cancel rates are ticking up with ARPU falling.

- The underperformance has been masked by tricky accounting. The company has never taken a goodwill impairment, yet subsidiary filings report multiple material goodwill impairments that don't appear to coincide with parent financials. We estimate at least $155 million in impairments based on visibility into $700 million in acquisitions.

\* \* \*

- We believe the company's audit committee simply cannot be relied upon, as a majority of the committee has worked together for years prior to serving on the board of J2 in roles that reveal conflicts of interest.

- The "independent" board approved the cancellation of J2's dividend to "create greater shareholder returns over the near, medium and long term". This apparently includes massive loss-making capital commitments and management fees to related parties.

- J2's young, newly minted CEO was compensated over $45 million during his first year in the role, more than the CEOs of Microsoft and J.P. Morgan, despite J2 being a fraction of the size. We can't help but wonder whether the board and executive team could be simply trading favors, in a manner consistent with J2's actions for decades.

(Emphasis in original.)

314.    On this news, the price of the Company's stock fell from $69.50 per share at the close of trading on June 29, 2020, to $63.21 per share at the close of trading on June 30, 2020, representing a loss in value of over 9%.

### Repurchases

315.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $171 million to repurchase approximately 2,205,779 shares of its own common stock at artificially inflated prices.[7]

316.    According to the 2015 10-K, during October 2015, the Company purchased 4,927 shares of its common stock for approximately $366,372, at an average price of $74.36 per share.

317.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $54,936 for repurchases of its own stock during October 2015.

318.    According to the 2015 10-K, during December 2015, the Company purchased 1,858 shares of its common stock for approximately $148,659, at an average price of $80.01 per share.

319.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $31,215 for repurchases of its own stock during December 2015.

320.    According to the 1Q16 10-Q, during February 2016, the Company purchased 5,136 shares of its common stock for approximately $355,771, at an average price of $69.27 per share.

---

[7] These shares include shares repurchased to satisfy tax withholding obligations related to employee stock options and the vesting of restricted stock issued to employees.

321.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $31,214 for repurchases of its own stock during February 2016.

322.    According to the 2Q16 10-Q, during May 2016, the Company purchased 24,314 shares of its common stock for approximately $1,569,955, at an average price of $64.57 per share.

323.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $33,067 for repurchases of its own stock during May 2016.

324.    According to the 3Q16 10-Q, during August 2016, the Company purchased 12,224 shares of its common stock for approximately $831,843, at an average price of $68.05 per share.

325.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $59,164 for repurchases of its own stock during August 2016.

326.    According to the 2016 10-K, during October 2016, the Company purchased 11,581 shares of its common stock for approximately $787,045, at an average price of $67.96 per share.

327.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $55,010 for repurchases of its own stock during October 2016.

328.    According to the 2016 10-K, during December 2016, the Company purchased 1,341 shares of its common stock for approximately $100,535, at an average price of $74.97 per share.

329.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $15,770 for repurchases of its own stock during December 2016.

330.    According to the 1Q17 10-Q, during February 2017, the Company purchased 2,941 shares of its common stock for approximately $253,191, at an average price of $86.09 per share.

331.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $67,290 for repurchases of its own stock during February 2017.

332.    According to the 1Q17 10-Q, during March 2017, the Company purchased 751 shares of its common stock for approximately $61,154, at an average price of $81.43 per share.

333.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $13,683 for repurchases of its own stock during March 2017.

334.    According to the 2Q17 10-Q, during May 2017, the Company purchased 39,360 shares of its common stock for approximately $3,524,294, at an average price of $89.54 per share.

335.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $1,036,349 for repurchases of its own stock during May 2017.

336.    According to the 2Q17 10-Q, during June 2017, the Company purchased 33,313 shares of its common stock for approximately $2,899,564, at an average price of $87.04 per share.

337.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $793,849 for repurchases of its own stock during June 2017.

338.    According to the 3Q17 10-Q, during July 2017, the Company purchased 1,620 shares of its common stock for approximately $137,165, at an average price of $84.67 per share.

339.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $34,765 for repurchases of its own stock during July 2017.

340.    According to the 3Q17 10-Q, during August 2017, the Company purchased 12,558 shares of its common stock for approximately $985,929, at an average price of $78.51 per share.

341.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $192,137 for repurchases of its own stock during August 2017.

342.    According to the 2017 10-K, during October 2017, the Company purchased 2,828 shares of its common stock for approximately $208,650, at an average price of $73.78 per share.

343.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $29,892 for repurchases of its own stock during October 2017.

344.    According to the 2017 10-K, during December 2017, the Company purchased 23,705 shares of its common stock for approximately $1,782,616, at an average price of $75.20 per share.

345.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $284,223 for repurchases of its own stock during December 2017.

346.    According to the 1Q18 10-Q, during February 2018, the Company purchased 3,801 shares of its common stock for approximately $276,751, at an average price of $72.81 per share.

347.   As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $36,490 for repurchases of its own stock during February 2018.

348.   According to the 1Q18 10-Q, during March 2018, the Company purchased 4,141 shares of its common stock for approximately $334,386, at an average price of $80.75 per share.

349.   As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $72,633 for repurchases of its own stock during March 2018.

350.   According to the 2Q18 10-Q, during May 2018, the Company purchased 25,643 shares of its common stock for approximately $2,209,914, at an average price of $86.18 per share.

351.   As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $589,020 for repurchases of its own stock during May 2018.

352.   According to the 2Q18 10-Q, during June 2018, the Company purchased 6,196 shares of its common stock for approximately $535,149, at an average price of $86.37 per share.

353.   As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $143,499 for repurchases of its own stock during June 2018.

354.   According to the 3Q18 10-Q, during July 2018, the Company purchased 1,401 shares of its common stock for approximately $122,728, at an average price of $87.60 per share.

355.   As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $34,170 for repurchases of its own stock during July 2018.

356.    According to the 3Q18 10-Q, during August 2018, the Company purchased 8,108 shares of its common stock for approximately $688,126, at an average price of $84.87 per share.

357.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $175,619 for repurchases of its own stock during August 2018.

358.    According to the 2018 10-K, during October 2018, the Company purchased 2,194 shares of its common stock for approximately $164,045, at an average price of $74.77 per share.

359.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $25,363 for repurchases of its own stock during October 2018.

360.    According to the 2018 10-K, during December 2018, the Company purchased 601,428 shares of its common stock for approximately $42,635,231, at an average price of $70.89 per share.

361.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $4,618,967 for repurchases of its own stock during December 2018.

362.    According to the 1Q19 10-Q, during January 2019, the Company purchased 10,158 shares of its common stock for approximately $699,683, at an average price of $68.88 per share.

363.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $57,596 for repurchases of its own stock during January 2019.

364.    According to the 1Q19 10-Q, during February 2019, the Company purchased 4,914 shares of its common stock for approximately $367,911, at an average price of $74.87 per share.

365.     As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $57,297 for repurchases of its own stock during February 2019.

366.     According to the 1Q19 10-Q, during March 2019, the Company purchased 1,328 shares of its common stock for approximately $111,193, at an average price of $83.73 per share.

367.     As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $27,251 for repurchases of its own stock during March 2019.

368.     According to the 2Q19 10-Q, during April 2019, the Company purchased 463 shares of its common stock for approximately $40,536, at an average price of $87.55 per share.

369.     As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $11,269 for repurchases of its own stock during April 2019.

370.     According to the 2Q19 10-Q, during May 2019, the Company purchased 28,370 shares of its common stock for approximately $2,490,886, at an average price of $87.80 per share.

371.     As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $697,618 for repurchases of its own stock during May 2019.

372.     According to the 2Q19 10-Q, during June 2019, the Company purchased 647 shares of its common stock for approximately $56,153, at an average price of $86.79 per share.

373.     As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $15,256 for repurchases of its own stock during June 2019.

374.    According to the 3Q19 10-Q, during July 2019, the Company purchased 1,611 shares of its common stock for approximately $143,411, at an average price of $89.02 per share.

375.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $41,580 for repurchases of its own stock during July 2019.

376.    According to the 3Q19 10-Q, during August 2019, the Company purchased 205,312 shares of its common stock for approximately $16,607,688, at an average price of $80.89 per share.

377.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $3,629,916 for repurchases of its own stock during August 2019.

378.    According to the 2019 10-K, during October 2019, the Company purchased 1,365 shares of its common stock for approximately $129,757, at an average price of $95.06 per share.

379.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $43,475 for repurchases of its own stock during October 2019.

380.    According to the 2019 10-K, during November 2019, the Company purchased 14,416 shares of its common stock for approximately $1,404,695, at an average price of $97.44 per share.

381.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $493,460 for repurchases of its own stock during November 2019.

382.    According to the 2019 10-K, during December 2019, the Company purchased 363 shares of its common stock for approximately $34,144, at an average price of $94.06 per share.

383.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $11,199 for repurchases of its own stock during December 2019.

384.    According to the 1Q20 10-Q, during January 2020, the Company purchased 67,560 shares of its common stock for approximately $6,373,610, at an average price of $94.34 per share.

385.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $2,103,143 for repurchases of its own stock during January 2020.

386.    According to the 1Q20 10-Q, during February 2020, the Company purchased 1,602 shares of its common stock for approximately $157,685, at an average price of $98.43 per share.

387.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $56,422 for repurchases of its own stock during February 2020.

388.    According to the 1Q20 10-Q , during March 2020, the Company purchased 691,370 shares of its common stock for approximately $56,422,706, at an average price of $81.61 per share.

389.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $12,721,208 for repurchases of its own stock during March 2020.

390.    According to the Company's quarterly report on Form 10-Q for the fiscal quarter ended June 30, 2020 (the "2Q20 10-Q"), during April 2020, the Company purchased 320,447 shares of its common stock for approximately $23,591,308, at an average price of $73.62 per share.

391.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $3,335,853 for repurchases of its own stock during April 2020.

392.    According to the 2Q20 10-Q, during May 2020, the Company purchased 23,817 shares of its common stock for approximately $1,855,106, at an average price of $77.89 per share.

393.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $349,634 for repurchases of its own stock during May 2020.

394.    According to the 2Q20 10-Q, during June 2020, the Company purchased 667 shares of its common stock for approximately $49,358, at an average price of $74.00 per share.

395.    As the Company's stock was actually worth only $63.21 per share, the price at closing on June 30, 2020, the Company overpaid by approximately $7,197 for repurchases of its own stock during June 2020.

396.    Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by over $32 million.

## DAMAGES TO J2 GLOBAL

397.    As a direct and proximate result of the Individual Defendants' conduct, J2 Global will lose and expend many millions of dollars.

398.    Such losses include over $32 million the Company overpaid when it repurchased its own common stock at artificially inflated prices during the Relevant Period before the fraud was exposed.

399.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against the Company, its CEO, its former CEO, and its CFO, and any

internal investigations and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

400.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

401.    As a direct and proximate result of the Individual Defendants' conduct, J2 Global has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

402.    Plaintiff brings this action derivatively and for the benefit of J2 Global to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of J2 Global, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act, as well as the aiding and abetting thereof.

403.    J2 Global is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

404.    Plaintiff is, and has been at all relevant times, a shareholder of J2 Global.  Plaintiff will adequately and fairly represent the interests of J2 Global in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

405.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

406.    A pre-suit demand on the Board of J2 Global is futile and, therefore, excused. At the time of filing of this complaint, the Board consists of the following ten individuals: Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross (the "Director-Defendants"), along with non-parties Scott C. Taylor and Pamela Sutton-Wallace (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time of the filing of this complaint.

407.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to cause the Company to engage in improper accounting practices and to make and/or cause the Company to make false and misleading statements and omissions of material fact, while seven of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $32 million for repurchases of its own stock, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

408.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in improper accounting practices and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was intended to make the Company appear more profitable and attractive to investors. While investors were duped into believing the fraud

perpetrated by the Individual Defendants, seven of the Director-Defendants sold Company stock at artificially inflated prices based on inside information. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

409.    Additional reasons that demand on Defendant Shah is futile follow.  Defendant Shah has served as the Company's CEO and as a Company director since January 2018. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Shah with his principal occupation, and he receives handsome compensation, including $2,151,811 during 2019 for his services. Defendant Shah was ultimately responsible for many of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $2.86 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Shah is a defendant in the Securities Class Action. For these reasons, Defendant Shah breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

410.    Additional reasons that demand on Defendant Bech is futile follow. Defendant Bech has served as a Company director since November 2000. He also serves as the Chair of the Company's Environmental, Social and Corporate Governance Committee (formerly, the

Corporate Governance and Nominating Committee), and as a member of the Compensation Committee. Defendant Bech has received and continues to receive compensation for his role as a director as described above. In addition, he has previously undisclosed relationships with Defendant Ressler. Specifically, Defendants Bech and Ressler both serve on the board of CMCT, which Defendant Ressler founded and controls as a principal. As a trusted Company director, Defendant Bech conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $5.16 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Bech signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Bech breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

411. Additional reasons that demand on Defendant Cresci is futile follow. Defendant Cresci has served as a Company director since 1998. He also serves as a member of the Company's Compensation Committee and Executive Committee. Defendant Cresci has received and continues to receive compensation for his role as a director as described above. In addition, he has previously undisclosed relationships with Defendant Ressler. Specifically, Defendants Cresci and Ressler both served simultaneously on the board of Presbia until at least 2019 before that company filed for delisting. Moreover, he serves with Defendants Ressler and Defendant Bech on the board of CMCT, which Defendant Ressler cofounded and where he remains a principal. As a trusted Company director, Defendant Cresci conducted little, if any, oversight of the scheme to cause the

Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $4.77 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Cresci signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Cresci breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

412.    Additional reasons that demand on Defendant Fay is futile follow. Defendant Fay has served as a Company director since February 2018. She also serves as the Chair of the Company's Compensation Committee, and as a member of the Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). Defendant Fay has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Fay signed, and thus personally made the false and misleading statements in the 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Fay breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

413.    Additional reasons that demand on Defendant Kretzmer is futile follow. Defendant Kretzmer has served as a Company director since July 2007. He also serves as the Chair of the

Company's Audit Committee. Defendant Kretzmer has received and continues to receive compensation for his role as a director as described above. In addition, he has previously undisclosed relationships with Defendant Ressler. Specifically, Defendants Kretzmer and Ressler have numerous previous busines relationships, spanning decades, at MAI Systems Corporation where Defendant Ressler was on the board while Defendant Kretzmer was CEO; at Universal Telecom where Defendant Ressler was on the board when Defendant Kretzmer was hired to perform consulting work; and at CIM Group, where both Defendants Ressler and Kretzmer currently serve on the board together. As a trusted Company director, Defendant Kretzmer conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $3.48 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Kretzmer signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Kretzmer breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

414. Additional reasons that demand on Defendant Miller is futile follow. Defendant Miller has served as a Company director since February 2015. He also serves as a member of the Company's Audit Committee and Environmental, Social and Corporate Governance Committee (formerly, the Corporate Governance and Nominating Committee). Defendant Miller has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to

engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sale, which yielded over $1.97 million in proceeds, demonstrates his motive in facilitating and participating in the fraud. Furthermore, Defendant Miller signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Miller breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

415.    Additional reasons that demand on Defendant Ressler is futile follow. Defendant Ressler has served as the Chairman of the Board and as Company director since 1997. He previously served as the Company's CEO from 1997 through 2000. He also serves as the Chair of the Company's Executive Committee. Defendant Ressler has received and continues to receive compensation for his role as a director as described above. In addition, he has numerous previously undisclosed relationships with Defendants Bech, Cresci, Kretzmer, and Ross which challenge his independence. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Ressler is himself implicated in certain of the material related party transactions described herein, including the allocation of $200 million in Company funds to Defendant Ressler's venture capital fund, Orchard Capital Ventures ("OCV"), which in turn diverted funds to a business run by Defendant Ressler's nephew. His insider sales, which yielded over $19.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.

Furthermore, Defendant Ressler signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Ressler breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

416.    Additional reasons that demand on Defendant Ross is futile follow. Defendant Ross has served as Company director since July 2007. He also serves as a member of the Company's Audit Committee and Compensation Committee. Defendant Ross has received and continues to receive compensation for his role as a director as described above. In addition, he has previously undisclosed relationships with Defendant Ressler which challenge his independence. Specifically, Defendants Ross and Ressler served as directors simultaneously on the board of MAI Systems Corporation, where Defendant Ressler was chair, from 2001 to 2006, the length of Defendant Ross's tenure. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to engage in improper accounting practices and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded over $4.44 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Ross signed, and thus personally made the false and misleading statements in the 2015, 2016, 2017, 2018, and 2019 10-Ks. For these reasons, Defendant Ross breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

417.    Additional reasons that demand on the Board is futile follow.

418.    Each of the Director-Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by millions of dollars for its own common stock during the Relevant Period. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

419.    As described above, seven of the Director-Defendants directly engaged in insider trading, in violation of federal law and the Company's Code of Conduct. Defendants Shah, Bech, Cresci, Kretzmer, Miller, Ressler, and Ross collectively received proceeds of over $42.6 million as a result of insider transactions executed during the Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

420.    As outlined in the Hindenburg Report and herein, the Director-Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For instance, Defendants Kretzmer and Zucker are both affiliated with Defendant Ressler's venture capital fund, OCV; Defendant Zucker serves as managing principal at the firm, and Defendant Kretzmer served as a mergers and acquisitions consultant for Orchard Capital, an OCV affiliate. Beyond OCV, Defendants Ressler, Kretzmer, and Ross have a business history spanning decades—specifically, Defendant Kretzmer served in various leadership roles at MAI Systems Corp., including as the CEO from 1999 until 2006 and as the CFO from 1993 until 1996 and again from 1999 until 2000, while Defendants Ressler served as the company's

Chairman, from 1995 to 2006, and Defendant Ross as a director, from 2001 to 2006, respectively. During his tenure at MAI Systems Corp., Defendant Ross also served as the chair of a special committee that approved a reverse stock split proposal that specifically increased the value of Defendant Ressler's stockholdings. Moreover, Defendants Bech and Cresci both currently serve as directors at CMCT, a business founded by Defendant Ressler, and where Defendant Ressler continues to serve as principal. Similarly, Defendants Ressler and Kretzmer currently serve on the board of CMCT's operator, CIM Group, where Defendant Ressler is co-founder and principal. In addition, Defendants Ressler and Cresci served on Presbia's board simultaneously, from 2015 until at least 2019 before Defendant Cresci's departure, while Defendant Zucker served on the board of its parent company, Presbia Holdings. Lastly, Defendants Bech, Cresci, Kretzmer, Ressler, and Ross have each served together on the Company's Board for over a decade. These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon the Director-Defendants would be futile.

421.    Defendants Kretzmer, Miller, and Ross (the "Audit Committee Defendants") served as members of the Audit Committee during the Relevant Period. Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the Company's accounting and financial reporting principles and policies, the Company's financial statements, and the performance of the Company's internal audit function. The Audit Committee Defendants failed to ensure the integrity of the Company's accounting and financial reporting processes, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting practices, to file false and misleading financial statements with the SEC, and to fail to maintain internal controls. Moreover, the Audit

Committee Defendants specifically approved certain of the material related party transactions described herein, including the allocation of $200 million to OCV. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

422.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to engage in improper accounting practices, to issue materially false and misleading statements to the public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of company records, public reports and communications, and uphold the responsibilities related thereto. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

423.    J2 Global has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for J2 Global any part of the damages J2 Global suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

424.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a

provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

425.    The acts complained of herein constitute violations of fiduciary duties owed by J2 Global's officers and directors, and these acts are incapable of ratification.

426.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of J2 Global.  If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion."  As a result, if the Director-Defendants were to sue themselves or certain of the officers of J2 Global, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

427.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause J2 Global to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

428.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence.  Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

429.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

430.     Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

431.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

432.     Under the direction and watch of the Directors, the 2018, 2019, and 2020 Proxy Statements (the "Proxy Statements") failed to disclose that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual

Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

433.    The Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, while failing to disclose that the Company's financial prospects were misrepresented as a result of false and misleading statements, causing the Company's share price to be artificially inflated and allowing the Individual Defendants to wrongfully benefit from the fraud alleged herein.

434.    Moreover, the Proxy Statements were false and misleading when they discussed the Company's adherence to specific governance policies and procedures, including the Code of Conduct, due to the Individual Defendants' failures to abide by them and their causing the Company to engage in improper accounting practices and issue false and misleading statements and/or omissions of material fact.

435.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, election of directors, advisory approval of executive compensation, and ratification of the Company's independent auditor.

436.    The false and misleading elements of the Proxy Statements led to, *inter alia*, the re-election of Defendants Shah, Bech, Cresci, Fay, Kretzmer, Miller, Ressler, and Ross, which allowed them to continue breaching their fiduciary duties to J2 Global.

437.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

438.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

### SECOND CLAIM

**Against Individual Defendants for Violations of
Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934**

439.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

440.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding J2 Global. Not only is J2 Global now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon J2 Global by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially-inflated prices, damaging J2 Global.

441.    During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

442.    The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about J2 Global not misleading.

443.    The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by J2 Global.

444.    The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.  The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

445.    In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director made and/or signed the Company's Form 10-Ks filed with the SEC during the Relevant Period.

446.    By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

447.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

### THIRD CLAIM

**Against the Individual Defendants for Violations of Section 20(a)
of the Securities Exchange Act of 1934**

448.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

449.    The Individual Defendants, by virtue of their positions with J2 Global and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of J2 Global and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause J2 Global to engage in the illegal conduct and practices complained of herein.

450.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

### FOURTH CLAIM

**Against the Individual Defendants for Breach of Fiduciary Duties**

451.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

452.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of J2 Global's business and affairs.

453.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

454.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of J2 Global.

455.     In breach of their fiduciary duties owed to J2 Global, the Individual Defendants willfully or recklessly caused the Company to engage in improper accounting practices, and made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose that: (1) the Company was party to a host of material, undisclosed related party transactions designed to enrich certain of the Individual Defendants and other Company insiders at the expense of the Company; (2) the Individual Defendants caused the Company to make use of improper accounting practices to obfuscate lackluster financial performance, including by failing to record certain goodwill impairments at the parent level; (3) many of the directors on the Company's Board had undisclosed, interlocking business relationships and interests, rendering them not independent or disinterested; and (4) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

456.     The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact.

457.     Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

458.     In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed, while nine of

the Individual Defendants engaged in lucrative insider sales, netting proceeds of over $51.5 million.

459.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of J2 Global's securities and disguising insider sales.

460.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of J2 Global's securities and disguising insider sales.

461.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

462.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, J2 Global has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

463.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Unjust Enrichment

464.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

465.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, J2 Global.

466.    The Individual Defendants either benefitted financially from the improper conduct and their engaging in lucrative insider transactions tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from J2 Global that was tied to the performance or artificially inflated valuation of J2 Global, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

467.    Plaintiff, as a shareholder and a representative of J2 Global, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

468.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Abuse of Control

469.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

470.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence J2 Global, for which they are legally responsible.

471.    As a direct and proximate result of the Individual Defendants' abuse of control, J2 Global has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, J2 Global has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

472.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

473.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

474.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of J2 Global in a manner consistent with the operations of a publicly-held corporation.

475.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, J2 Global has sustained and will continue to sustain significant damages.

476.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

477.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

478.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

479.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

480.    In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

481.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

482.    Plaintiff on behalf of J2 Global has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of J2 Global, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to J2 Global;

(c)     Determining and awarding to J2 Global the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing J2 Global and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect J2 Global and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of J2 Global to nominate at least five candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding J2 Global restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: December 11, 2020                Respectfully submitted,

                                        **FARNAN LLP**

                                        /s/ Michael J. Farnan
                                        Brian E. Farnan (Bar No. 4089)
                                        Michael J. Farnan (Bar No. 5165)
                                        919 N. Market St., 12th Floor
                                        Wilmington, DE 19801
                                        Telephone: (302) 777-0300
                                        Facsimile: (302) 777-0301
                                        Email: bfarnan@farnanlaw.com
                                                mfarnan@farnanlaw.com

Of Counsel:

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com